**Perry MULLIS, d/b/a Mullis Petroleum Co., Plaintiff-Appellee,**

v.

**ARCO PETROLEUM CORPORATION and Atlantic Richfield Corporation, Defendants-Appellants.**

**No. 73–1625.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1974.

Decided Aug. 5, 1974.

Helen H. Cutner, Philadelphia, Pa., John J. Voortman, Chicago Ill., Richard D. Wagner, Indianapolis, Ind., for defendants-appellants.

James E. Rocap, Jr., Thomas P. Ledgerwood, Indianapolis, Ind., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

The question presented by this appeal is whether either the Robinson-Patman Act[1] or § 2 of the Sherman Act[2] protects a local jobber from an otherwise lawful termination at a time when, because of the existence of an acute shortage, he cannot find another source of supply.

Plaintiff has been a distributor of petroleum products for defendant, ARCO, or its predecessor, Sinclair, in Lawrence County, Indiana, and its environs for the past 20 years.[3] Notwithstanding occasional threats by plaintiff to take his patronage elsewhere, and notwithstanding various disputes which defendant emphasizes and plaintiff minimizes, nothing serious enough to cause a rupture in the business relationship occurred until shortly before the "energy crisis."

On February 15, 1973, defendant notified plaintiff that his distributorship was cancelled; the termination date, originally set for March 31, 1973, was extended to May 31, 1973.[4] Plaintiff canvassed some 20 other suppliers of petroleum products to obtain a new source, but none would agree to serve him. On May 7, 1973, he commenced this litiga-

---

1. Plaintiff apparently relies upon 15 U.S.C. §§ 13(a) and (d).

2. 15 U.S.C. § 2 provides:

   § 2. Monopolizing trade a misdemeanor; penalty.

   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

3. In approximately 1954 plaintiff began as a marketer, i.e., an agent selling on a commission basis, for Sinclair Petroleum Co. He became a jobber for Sinclair in 1961, and a jobber for defendant when it merged with Sinclair in 1969. ARCO is apparently a subsidiary of the other defendant in this action, Atlantic Richfield Co.

4. In December of 1971 plaintiff and defendant entered into a jobber's contract which was to run from month to month for a period of 10 years and was cancellable on 10 days written notice.

tion. In his complaint plaintiff described his business, the receipt of the notice of cancellation and the current market situation, and alleged that ARCO's acts constituted "an attempt to monopolize the marketing area in which plaintiff operates," and resulted in discrimination against him. After an evidentiary hearing, the district court entered an order enjoining defendant from refusing to furnish petroleum products to the plaintiff until further order of court. Defendant appeals from that order.

There is no question about the sufficiency of plaintiff's proof of irreparable injury. His business, upon which he places a value of $500,000, involves the distribution of approximately 433,000 gallons of gas and 250,000 gallons of fuel oil per month. He services 20 retail gasoline stations, four of which he owns, and also supplies various governmental units, industrial customers and farms in and about Lawrence County, Indiana. Since he sells only ARCO petroleum products, and since he is unable to obtain a new supplier, it is reasonable to infer that termination of his distributorship will terminate his business.[5]

■■ Irreparable injury is not in itself a sufficient predicate for the entry of a preliminary injunction.[6] There must also be substantial reason to believe that the conduct of which the plaintiff complains is unlawful and is the cause of his threatened loss.[7] How clear the showing of illegality must be will vary from case to case; no doubt, the greater the urgency and the greater the extent of the impending injury, the more appropriate it may be to retain the status quo temporarily while the court appraises the strength of the legal claim. Thus, the requirement of a "reasonable likelihood of success" is necessarily a somewhat flexible standard that allows the chancellor room for the exercise of judgment. At the very least, however, plaintiff must demonstrate that his claims are "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.' "[8]

■ In this case it is perfectly clear that, even if plaintiff is able to prove a violation of the Robinson-Patman Act, there is no causal connection between that violation and his termination. We

---

5. We are not persuaded by ARCO's argument that the entry of the preliminary injunction is causing it irreparable injury. ARCO apparently operates nationwide in producing, refining and marketing petroleum products. It introduced evidence tending to show that plaintiff had from time to time engaged in unethical conduct and had refused to pay bills for insufficient reasons, and that the profitability of the business relationship was marginal. Since many of these difficulties had apparently existed throughout much of the long relationship between the parties, they do not undermine the district court's implicit conclusion that the balance of hardship was tipped substantially in plaintiff's favor.

6. *See* Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 324 (2d Cir. 1969), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777.

7. Justice Marshall, in an opinion joined by Chief Justice Burger and Justices Stewart and Blackmun, observed that, when a court issues a preliminary injunction, "one important element of its judgment is its estimate

of the probability of ultimate success on the merits" by the plaintiff. Atchison, T. & S. F. Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 821, 93 S.Ct. 2367, 2382, 37 L.Ed.2d 350. The basis of this requisite is described by one author as follows:

The Court [of Chancery] interferes on the assumption that the party who seeks it interference has the legal right which he asserts, but needs the aid of the Court for the protection of the property in question until the legal right can be ascertained. The office of the Court to interfere being founded on the existence of the legal right, a man who seeks the aid of the Court must be able to show a fair *prima facie* case in support of the title which he asserts.

W. Kerr, Injunctions 15 (6th ed., J. Patterson ed. 1927).

8. Mytinger & Casselberry, Inc. v. Numanna Laboratories Corp., 215 F.2d 382, 385 (7th Cir. 1954), *quoting* Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953). *See* Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205–1207 (2d Cir. 1970).

are also convinced that there is no basis in the record for concluding that ARCO is violating § 2 of the Sherman Act. We therefore reverse.

## I.

ARCO sells gasoline directly to retail service stations in the Lawrence County area. These stations compete with the 20 stations that are supplied by plaintiff. Plaintiff has asserted that ARCO discriminates in favor of its own retail outlets and against plaintiff in two different ways.

■ First, in his complaint plaintiff apparently took the position that the termination itself was discriminatory since ARCO planned to continue supplying its own outlets while refusing to sell to him. It has long been settled, however, that such discrimination does not violate the Robinson-Patman Act.[9] For that statute does not require a seller to create or to maintain a customer relationship with any buyer or prospective buyer.[10]

■ Second, on appeal plaintiff's Robinson-Patman claim is solely that a two cent per gallon rebate made available to retailers participating in defendant's so-called "Mini Service" program illegally discriminated against him.[11] Assuming that to be true, such illegality could be removed without modifying the "Mini Service" program simply by discontinuing sales to customers, such as plaintiff, who did not participate in that program. Since one method of terminating that illegality would be to terminate plaintiff's distributorship, it is manifest that an assumption that the "Mini Service" program was illegal does not justify an injunction imposing a continuing business relationship upon these parties.[12] More fundamentally, there is neither a finding nor evidence that plaintiff's termination was in any way connected to the "Mini Service" program. Accordingly, plaintiff's Robinson-Patman claim does not support the injunction entered by the district court.[13]

## II.

Alternatively, plaintiff contends that his termination during a period of shortage will totally exclude him from the market and, therefore, violate § 2 of the Sherman Act. He characterizes the alleged violation as an attempt to monopolize, although presumably, if his theory were valid, as soon as the termination becomes effective, the attempt would ripen into a completed monopolization. Plaintiff's theory is not entirely clear, but apparently rests upon the premise that the competition which has heretofore existed between plaintiff and defendant in the sale of ARCO products in Lawrence County will be replaced by

---

9. Naifeh v. Ronson Art Metal Works, Inc., 218 F.2d 202 (10th Cir. 1954); Chicago Seating Co. v. S. Karpen & Bros., 177 F.2d 863 (7th Cir. 1949); Shaw's, Inc. v. Wilson-Jones Co., 105 F.2d 331 (3d Cir. 1939).

10. Consider the following proviso of 15 U.S. C. § 13(a):
    [N]othing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade. . . .

11. Defendant offered a program whereby certain Arco service stations could have two sets of gasoline pumps. At one, the customer would receive both gas and services such as having his windows washed and oil checked. At the other, he would receive only gas, but at a rate of two cents per gal-

lon less than that at the full service pumps. For every gallon sold at the "Mini Service" pumps, defendant gave the service station a two cent rebate towards the purchase of more gasoline. This program was allegedly not made available to plaintiff or to his retail outlets.

12. In O. M. Droney Beverage Co. v. Miller Brewing Co., the court stated:
    Moreover, even where there are proven violations of the [Robinson-Patman] act the common remedy is to enjoin the violations by [defendant] . . . and not to impose a continuing business relationship between the parties.
    365 F.Supp. 1067, 1071–1072 (D.Minn.1973) (citations omitted).

13. Indeed, under that injunction ARCO remains free to continue its "Mini Service" program without offering it to plaintiff.

defendant's monopoly control of such sales after the termination becomes effective. It is first appropriate to identify the reasons why plaintiff's § 2 claim would be manifestly insufficient if there had been no shortage, and then to consider the relevance of the shortage.

### A.

▇ Whether a complaint alleges monopolization or an attempt to monopolize, it is incumbent upon the plaintiff to define the relevant market in which the defendant's actions are to be appraised.[14] Since the statute has "both a geographical and distributive significance," Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356, the market definition must include a description of both the territory encompassed and the product involved.[15]

14. The critical importance of this requirement is identified by Chief Judge Swygert in the concluding portion of his opinion in Bernard Food Industries, Inc. v. Dietene Co.:

Section 2 of the Sherman Act proscribes an attempt "to monopolize any part of the trade or commerce among the several States." Judge Learned Hand succinctly stated the elements of a Section 2 violation: "In order to fall within § 2, the monopolist must have both the power to monopolize, and the intent to monopolize." United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945). There is no evidence whatever to indicate that the defendant's conduct in publishing the comparison sheet manifested an intent to monopolize. Absent also is any evidentiary basis for holding that the defendant possessed the power to monopolize. *Moreover, there is no proof of what constituted the relevant market. Without such a determination, the question of a monopoly or an attempt to accomplish such a goal could in no manner be meaningfully answered. A definition of the relevant market is an essential element of a violation under Section 2 of the Sherman Act.* United States v. Grinnell Corp., 384 U.S. 563, 570, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). 415 F.2d 1279, 1284 (7th Cir. 1969), cert. denied, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed. 2d 92 (emphasis added). In Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177–178, 86 S.Ct. 347, 15 L.Ed.2d 247, Justice Clark, speaking for the Court, made it clear that the basic importance of defining the relevant market is as applicable to an attempt case as to other § 2 claims. *See also* Acme Precision Products, Inc. v. American Alloys Corp., 484 F.2d 1237 (8th Cir. 1973), holding at page 1242 that the burden of proof as to the relevant market rests upon the claimant.

15. The importance of defining the relevant "area of effective competition" was explained at pages 44–45 of the Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) (footnotes omitted):

Whether monopoly power for purposes of Section 2 exists requires first a definition of the market within which it is to be measured. For the distinction between competition and monopoly turns on power in a relevant market. Although the word "market" does not appear in the statute, it is a necessary element of the concepts of monopoly and of certain restraints of trade upon which the statute rests.

The appropriate market is the "area of effective competition" within which the defendant or defendants operate. [Standard Oil Co. of California v. United States, 337 U.S. 293, 299–300 n.5 (69 S.Ct. 1051, 93 L.Ed. 1371)]. "The problem of defining a market turns on discovering patterns of trade which are followed in practice." [United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 303 (D.Mass. 1953), aff'd per curiam, 347 U.S. 521 (74 S.Ct. 699, 98 L.Ed. 910)]. Identification of markets required for solution of an antitrust problem is primarily one of fact. The starting point is to ascertain the actual competition to which the defendants are exposed, and the effect on rivals of the conduct they have undertaken. For these purposes, the market is normally identified both in terms of the trade in products, field or services affected by the conduct, and the geographical areas within which such trade may be limited. The Sherman Act, the Supreme Court said, in Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co. [293 U.S. 268, 279 (55 S.Ct. 182, 185, 79 L.Ed. 356)], has "both a geographical and distributive significance and [it applies] to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce."

The kind of market analysis which the Committee understood the statute to require was employed by the Supreme Court in United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 389–396, 76 S.Ct. 994, 100 L. Ed. 1264.

■ In this case plaintiff has not directly addressed the relevant market issue, but seems to assume that it consists of the sale of ARCO petroleum products in the Lawrence County area. That assumption is not supported by the evidence but is, in fact, contradicted by it. Plaintiff offered no evidence to prove that there are any legal or economic barriers to competition from areas immediately adjacent to Lawrence County. More significantly, there is no proof suggesting that ARCO products are in any way different from other brands of petroleum products available in Lawrence County. Even if we were to assume, without proof, that ARCO's gasoline or fuel oil is not a standardized commodity, either because of physical characteristics of the product or because advertising has enhanced its consumer acceptance, there is no evidence indicating the extent of its differentiation from other brands or the competitive significance of any such possible differentiation.[16] The only relevant evidence in the record proves that ARCO products are in active competition with other brands.[17] Under the kind of economic analysis employed by both the majority and the dissent in United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264,[18] plaintiff clearly failed to prove that sales of ARCO petroleum products in Lawrence County, Indiana, constitute a relevant market.[19]

16. In *du Pont, supra* note 15, the Court also noted:

> [O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

351 U.S. at 393, 76 S.Ct. at 1006 (footnotes omitted).

17. Plaintiff's testimony that he purchased fuel from Marathon Oil in 1970 and that, at various times, he considered a change in his course of supply, Tr. 92, 121–24, indicates a degree of interchangeability between ARCO products and other brands. Plaintiff also testified that the price he charged his customers had to be competitive with the price which distributors of other petroleum companies charged. If certain customers received lower bids from these distributors, plaintiff could seek a special allowance, a "MEA", from defendant, thereby permitting him to sell at a lower price. Tr. 54–62, 114–19. Finally, he testified that, because retail outlets selling ARCO products would engage in "price wars" with outlets selling other brands, defendant would sustain them with another type of allowance, a "TVA". Tr. 62–68. As the Court suggested in *du Pont, supra* note 15, competition cannot be controlled unless one has power over price. 351 U.S. at 392, 76 S.Ct. 994. By plaintiff's own testimony, no such power existed.

18. Although the dissenting Justices disagreed with the majority's appraisal of the significance of competition between cellophane and other flexible packaging materials, they accepted the basic premise that the proper definition of the market was the critical issue in that case as in other Sherman Act litigation. *See, e.g.,* 351 U.S. at 414, 76 S.Ct. 994. In his dissenting opinion, Chief Justice Warren identified significant physical differences between cellophane and other flexible wrapping materials (differences in bursting strength, permeability and transparency) and then evaluated the economic significance of the differences, noting, for example, that price changes in cellophane did not always affect the price of the other materials which the majority considered part of the relevant market.

19. Claims that refusals to deal were violative of § 2 have often failed because the plaintiff incorrectly assumed that proof of the so-called monopoly which a manufacturer has over his own product is tantamount to proof of dominance in an economic market. *See, e.g.,* Bushie v. Stenocord Corp., 460 F.2d 116, 120–121 (9th Cir. 1972); Cal Distributing Co. v. Bay Distributors, Inc., 337 F. Supp. 1154, 1157–1159 (M.D.Fla.1971); South End Oil Co. v. Texaco, Inc., 237 F. Supp. 650, 655–656 (N.D.Ill.1965). On the other hand, courts which have been persuaded that such dominance exists have held refusals to deal violative of § 2. *See, e.g.,* Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Poster Exchange, Inc. v. National Screen Service Corp., 431 F.2d 334 (5th Cir. 1970), cert. denied, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811.

Moreover, if we make the realistic assumption that the relevant market encompasses the sale of competing brands as well as ARCO products, plaintiff's evidence would place ARCO's position in the market far from the monopoly end of the spectrum that separates pure monopoly from pure competition. For the record indicates that at least 20 other suppliers of gasoline and oil sell in Lawrence County, and that ARCO's share of the business is less than 3% of the total.[20] There is no evidence that its share is growing, and certainly no basis for inferring any dangerous probability that it would ever approach monopoly proportions.[21] In sum, apart from the problem created by the shortage of petroleum, there is not even colorable support in the record for the conclusion that defendant is guilty of violating § 2 of the Sherman Act.

## B.

Plaintiff apparently contends that the shortage requires a different result in this case because alternative sources of supply were not in fact available to him and, therefore, the relevant market must be narrowly defined to include only ARCO products sold in the Lawrence County area. In appraising the legal significance of the shortage, we first review the evidence in the record and then consider whether taking judicial notice of the severity of the energy crisis which ensued would affect that analysis.

The supply available in any market may, of course, be affected by legal factors as well as purely economic factors. As far as this record discloses, at the time ARCO made its decision to cancel plaintiff's distributorship, there were no legal barriers to price changes, to changes in methods of distribution or to shifting custom from one seller to another or from one buyer to another. The record evidence of a shortage consisted merely of plaintiff's testimony that each of the 20 competitors of ARCO whom he approached would not supply him and, further, that ARCO's regional manager had told him that jobber contracts were not being renewed "because of the shortage of the product." [22]

Nothing in this evidence would justify the conclusion that the relevant competitive market should be treated as including only ARCO products. It is entirely possible that all 20 of ARCO's competitors had valid reasons, unrelated to any shortage, for not wishing to establish business relations with plaintiff. If that should not be true, no reason is apparent from the record why he was not free to offer to pay a higher price, or to perform superior services, than existing distributors of competing brands of gasoline, and thereby to secure product from one of ARCO's competitors. Unquestionably, the constriction of supply would tend to force the price level to rise, but presumably ARCO and its 20-odd competitors would all be affected in a roughly comparable way. The fact that in such a market plaintiff might have to offer an unusually high price, or unusually favorable terms, in order to obtain a new source of supply, is not a reason for redefining the market to include less than all of the firms competing within it.

Accordingly, if we assume that the competitive market remained free of any artificial restraint, the mere fact that

---

20. The evidence establishes that defendant sells approximately 3% of the gasoline sold in the State of Indiana; presumably its share of the Lawrence County market is about the same. There was no evidence as to its share of the market in other petroleum products; presumably its share was also about 3%.

21. *Cf.* Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 597–599 (7th Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796.

22. Tr. 78. There is also testimony that in September of 1972 one of ARCO's representatives stated at a meeting of jobbers that there "would and could likely be some fuel shortages, but they would take care of their own distributors." Tr. 92.

lesser quantities were available for sale at higher prices would not limit the number of alternative sources which might reasonably be available to any firm desiring to obtain or to retain a distributorship. Indeed, if anything, a significant increase in the price of the raw product would tend to diminish the significance of transportation costs, and thereby enlarge the geographical area in which distributors were effectively competing both in the purchase and in the sale of the product. Moreover, if the existence of a shortage required us to construe the Sherman Act as making an otherwise lawful substitution of one distributor for another illegal—or even of doubtful legality—the statute would have the anomalous effect of creating, rather than removing, restraints on competition during periods of short supply. For such a construction of the law might be the deciding factor which would cause another oil company to deny plaintiff the opportunity to replace a less efficient distributor. We are satisfied that nothing in plaintiff's evidence justifies a redefinition of the relevant market.

Realistically, we recognize that, during periods of acute shortage or national emergency, the free market is often restrained by regulatory controls. A variety of restrictions may preclude the price changes which normally occur in response to fluctuations in supply and which may in turn have their impact upon the flow of capital and, ultimately, output. Plaintiff may appropriately ask us to take judicial notice of the fact that, during the energy crisis, oil companies were not entirely free to adjust prices or to take on a new distributor simply because it would be good business to do so. Conceivably, therefore, emer-

gency controls might either require ARCO to retain plaintiff as a distributor or, if his cancellation had already become effective, prevent any of ARCO's competitors from accepting him as an additional or as a substitute distributor. Accordingly, depending upon the impact of those controls, plaintiff might be in a position to argue that the relevant market should be narrowly defined to include only the product which is in fact available to him.

Although exceptional regulatory controls may significantly restrain competition within the relevant market, we do not believe they justify a redefinition of the market. For the various brands of gasoline would retain the physical characteristics that make them readily interchangeable for essentially the same uses. Indeed, such factors as advertising of particular brands, which tend to differentiate otherwise similar products, become less significant in times of shortage. Whether viewed from the standpoint of the ultimate consumer, or of a distributor such as plaintiff, it would be less important to obtain a particular kind of gasoline than to purchase any gasoline at all. The so-called "cross elasticity of demand" would tend to enlarge the relative product market as the competition among buyers of petroleum.

The fact that an injury to a particular competitor may be unusually severe is not a justification for adopting a market definition which only considers the particular product line which he has previously sold or purchased. For in Sherman Act litigation we must adhere to the admonition that the statute is concerned "with the protection of *competition*, not *competitors*." [23] And whether the competition is more intense

---

23. The quotation is from Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510, which specifically considered the 1950 amendment to § 7 of the Clayton Act. There is no doubt, however, that the comment is equally applicable to the Sherman Act.

When the Court has referred to situations in which the ready availability of competitive

products precludes a conclusion that the Sherman Act has been violated, see, e.g., United States v. Arnold, Schwinn & Co., 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249, the reference has been directed at what is "available in the market," United States v. du Pont, *supra* note 15, 351 U.S. at 394, 76 S.Ct. 994, rather than at what is available to any particular competitor.

on the seller's or the buyer's side of the market, we may not arbitrarily segregate one brand from equally acceptable substitutes in order to protect a particular competitor from injury.

If the artificial restraints imposed by the government during a period of shortage make it appropriate to characterize ARCO as a monopolist for purposes of construing the Sherman Act, it would seem to follow that each of the 20 other oil companies, and perhaps each of the independent jobbers who sell to retail service stations in the same area, is equally a monopolist. For, conceivably, if the shortage is sufficiently acute, any one of those distributors might have the power—assuming that no contract or regulatory objection interferes—to discontinue sales to a retailer and, therefore, to put him completely out of business. If each such action were violative of § 2, the Sherman Act would, in effect, outlaw any change in existing patterns of distribution until after an acute shortage was ameliorated.

From a broad policy standpoint, perhaps such a temporary freeze would serve the public interest. Such a freeze might be an appropriate, even a necessary, counterpart to an emergency price control program. Historically, however, that kind of regulation of the economy has only been undertaken by a public agency pursuant to express legislative authorization. The Sherman Act has never been construed as a broad charter authorizing the judiciary to fashion such controls.[24] Quite the contrary, it is such regulation, when accomplished by private action, that the Sherman Act was specifically intended to prohibit. Certainly that statute should not be construed as an authorization to the judiciary to engage in the kind of economic regulation that the statute was designed to outlaw.[25]

To the extent that the antitrust laws remain applicable in an industry which is partially regulated by the government, their office remains the same as in an industry which is totally unregulated.[26] Regulatory controls may

24. Compare the comment by the Fourth Circuit in Davis v. Crown Central Petroleum Corp., in which plaintiffs claimed that the petroleum shortage justified an exceptional interpretation of their contract rights:

The claim of the plaintiffs is appealing and our sympathies are with them. As the District Courts indicated, it is equitable in periods of scarcity of basic materials for the Government to inaugurate a program of mandatory allocations of the materials. This, however, is a power to be exercised by the legislative branch of Government. The power of the Court extends only to the enforcement of valid contracts and does not comprehend the power to make mandatory allocations of scarce products on the basis of any consideration of the public interest. Public reports indicate that Congress is cognizant of the problem presented by these actions and is giving active consideration to the establishment of a program of mandatory allocations that would apply from the oil producer down to the oil retailer. It is earnestly hoped that Congress will take the necessary steps to establish such controls. For that control, however, the parties must look to the Congress and not to the Courts.

483 F.2d 1014, 1017 (1973).

25. *Compare* Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219.

26. *See, e.g.*, United States v. Borden Co., 308 U.S. 188, 199–200, 60 S.Ct. 182, 84 L.Ed. 181. The underlying concern of the Sherman Act is precisely the opposite of the office plaintiff would have it perform. It reflects the conviction that the free market, reacting to a plurality of independent entrepreneurial decisions, will best serve the interests of the consumer and the general public. It therefore proscribes private regulation of the marketplace, either by agreements among should-be competitors or by the exercise of monopoly power by a single firm. The theory of the law is that the market which performs most effectively is the one that is most free from artificial restraint. Generally, the purpose of an enforcement proceeding is to eliminate private restraints in order to enable the market to adjust itself to changing circumstances. It is assumed that a desirable adjustment will be brought about by market decisions made independently by competitors seeking to maximize their respective profits or to minimize their respective losses.

limit price, either in maximum or minimum terms which the seller may charge; may require the continuation of service to unprofitable accounts; or may direct that products in short supply be allocated to essential or priority uses.[27] Such functions, however, are not properly performed by laws which are designed to eliminate restraints of trade.[28]

We therefore conclude that, whether we just consider the evidence of shortage in the record, or whether we also take cognizance of the distortions that may be produced by emergency measures, the injury of which plaintiff complains is not remediable under the Sherman Act. That statute does not authorize the judiciary to supplement imperfect regulatory controls imposed by other branches of government.[29]

Reversed.

---

27. *See* the materials cited by the Supreme Court in *du Pont, supra* note 15, 351 U.S. at 388–389 n. 14, 76 S.Ct. 994.

28. "Despite possible advantages to a stable economy from efficient cartels with firm or fixed prices for products, it is crystal clear from the legislative history and accepted judicial interpretations of the Sherman Act that competition on prices is the rule of congressional purpose and that, where exceptions are made, Congress should make them." United States v. Line Material Co.,

333 U.S. 287, 309–310, 68 S.Ct. 550, 562, 92 L.Ed. 701.

29. *Cf.* Mandel v. Simon, 493 F.2d 1239, 1240 (Em.App.1974) :

The record indicates that Appellants are in good faith attempting to correct these inequities as promptly as they are discovered. The Federal Energy Office must have great flexibility during the formative period of regulation. Judicial interference at this time may delay rather than advance effective regulation of this area.