SUBURBAN BEVERAGES,
INC., Plaintiff,

v.

PABST BREWING COMPANY,
Defendant.

No. 78–C–750.

United States District Court,
E. D. Wisconsin.

Dec. 18, 1978.

Irvin B. Charne, Charne, Glassner, Tehan, Clancy & Taitelman, Milwaukee, Wis., James R. Safley, Robins, Davis & Lyons, Minneapolis, Minn., for plaintiff.

John K. MacIver, Michael, Best & Friedrich, Milwaukee, Wis., for defendant.

## MEMORANDUM AND ORDER

WARREN, District Judge.

Plaintiff, Suburban Beverages, Inc., has filed a motion for a preliminary injunction. Plaintiff's complaint asserts four different causes of action based on state and federal law: 1) violation of Section 1 of the Sherman Antitrust Act; 2) violation of Wisconsin Statutes Section 133.01, which is in effect, Wisconsin Antitrust law; 3) violation of Wisconsin's Fair Dealership law, Section 135.01; and 4) breach of contract.

The facts of this case indicate that the plaintiff has a contract with Pabst Brewing Company in which the plaintiff is permitted to act as a distributor for Pabst beverages in Ozaukee County. Under a prior agreement, Pabst permitted Suburban Beverages to sell Pabst's beverages also in the Milwaukee County area, specifically North of, but not on, Silver Spring Drive.

According to the allegations in plaintiff's complaint, Pabst forced Suburban to sign an agreement on June 1, 1971, which limited Suburban's territory to Ozaukee County thus eliminating Suburban from distributing Pabst products in the Milwaukee County area. Nevertheless, plaintiff alleges that it maintains several accounts in the Milwaukee County area. Basically, plaintiff complains that in retaliation for this competition with Pabst, Pabst has noticed plaintiff that it has terminated plaintiff's distributorship effective November 30, 1978. Plaintiff claims this violates their contract with Pabst, Wisconsin fair dealership laws, Wisconsin antitrust laws, and the Sherman Antitrust Act.

After oral argument on the legal issues in this case, this Court entered a temporary restraining order, which will expire December 18, 1978 at 5:00 P.M., enjoining defendant from terminating plaintiff's distributorship. Due to the complexities of this case, an evidentiary hearing was held on December 8, 1978 in reference to plaintiff's motion for a preliminary injunction pending the proceedings of this case.

Defendant has vigorously opposed plaintiff's motion asserting that its termination of plaintiff's distributorship was not in violation of the antitrust laws, but, nevertheless, even if the termination did violate the Sherman Act, defendant asserts that it is entitled to a labor exemption from the antitrust laws. Although both parties have briefed and argued the issue of an antitrust violation, their primary emphasis has been focused on whether defendant is entitled to an antitrust exemption. During the course of the evidentiary hearing, this Court learned something about the beer manufacturing and distribution business, specifically as it applied to defendant's business. Furthermore, defendant presented extensive evidence concerning its relationship with its union and the acute labor problems that it has been experiencing in recent years. Reviewing the evidence presented by both parties, the Court finds the following pertinent facts.

Plaintiff, Suburban Beverages, Inc., is a close corporation owned by Michael Moriarty and managed exclusively by members of Mr. Moriarty's immediate family. Although plaintiff distributes other brands of beer, the bulk of its sales involves defendant's products. Mr. Moriarty testified, and this point was unrefuted, that termination of the distributorship of Pabst products would be disastrous to plaintiff's business. The primary reason for this disaster is the unavailability of other major brand distributorships in Milwaukee and surrounding counties. According to Mr. Moriarty, inquiries were made to the major brand manufacturers, which inquiries indicated such unavailability.

The competition at issue in this case is intrabrand between Suburban and the city sales office in the northern portion of Milwaukee County. As indicated earlier, plaintiff originally had responsibility for the northern part of Milwaukee County, but on June 1, 1971 this area was taken and plaintiff's primary territory was limited to Ozaukee County. Nevertheless, plaintiff continued to sell in Milwaukee County erratically, depending upon the amount of pressure placed upon plaintiff by the defendant. The reason for defendant's limitation of plaintiff's territory and for defendant pressuring plaintiff to refrain from selling Pabst products in Milwaukee County was to end competition between plaintiff and defendant's city sales office.

In Milwaukee County, defendant sells beer directly to numerous retail outlets through a city sales office. The retail customers of this city sales office are serviced by trucks driven by employees of defendant. Each truck is assigned one driver and one helper, and that crew is assigned a set route. All of the drivers and helpers are members of the Brewery Workers Local Union Number 9 (the "Union"), which Union represents certain employees of the defendant.

The clash between the city sales office and plaintiff concerns plaintiff's sales of goods to retailers in the northern part of Milwaukee County. If there are fewer retailers purchasing directly from city sales, then there are fewer routes available and consequently defendant requires fewer helpers and drivers. The Union is interested in job protection and has pressured defendant to give the city sales office exclusive rights to sell defendant's products to retailers in the Milwaukee County area.

The Union particularly relies upon the collective bargaining agreement (CBA) which the Union membership and leadership understand gives the city sales office virtually exclusive rights to sell defendant's products to retailers in Milwaukee County. The pertinent part of the CBA between the Union and defendant provides:

All direct deliveries of beer by the Employer to all licensees within Milwaukee County shall be made exclusively by drivers and helpers of the Union. No licensee whose place of business is located in Milwaukee County shall be permitted to pick up beer at the brewery. When beer is delivered to any licensee whose premises are located in Milwaukee County, it shall be delivered directly to the retail outlet of said customer by drivers and helpers of the Union. The existing practice of existing distributors delivering to other licensees shall not be enlarged upon. During the term of this agreement, the City Delivery Department shall not be permanently closed.

It is the Union's understanding, whether or not accurate, that the city sales office, through Union drivers and helpers, has exclusive rights to sell in Milwaukee County. There is a provision in the agreement that states: "[T]he existing practice of existing distributors delivering to other licensees shall not be enlarged upon." This provision was covered in the hearing and properly placed in perspective.

The drivers and helpers delivering for city sales only work limited hours per day and only five days per week. To assure that retailers can get shipments in off-periods, i. e., nights, weekends and holidays, certain beer depots exist in Milwaukee which warehouse the defendant's products and can make off-hour deliveries. According to the Union's understanding of this agreement, in light of the business practice, the term distribution in the CBA applies only to the depots and not to distributors such as the plaintiff.

The CBA between defendant and the Union was first signed and has been continuously in effect since 1954, whereas the contract between plaintiff and defendant was first signed in 1959. Furthermore, the original agreement between plaintiff and defendant provided for plaintiff's territory to extend into the northern part of Milwaukee County. Clearly, on its face, there is a conflict of rights here, as the agreement is interpreted by the Union.

This conflict caused defendant problems over the years, but the Union's pressure did not become too severe until the 1960's when the northern section of Milwaukee County began to expand. It was then that plaintiff's sales came into severe conflict with city sales and, therefore, defendant proffered and plaintiff signed, under protest, the distributorship contract limiting plaintiff's territory to Ozaukee County.

Notwithstanding the contract between plaintiff and defendant, plaintiff continued to sell in Milwaukee County. Although, as indicated earlier, defendant placed pressure on plaintiff to force plaintiff to sell only in Ozaukee County, defendant was reluctant to limit plaintiff under threats of termination in light of *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), which held that territorial restraints were per se violations of the antitrust laws. However, when the United States Supreme Court ruled in the case of *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), holding that territorial restraints are not per se violations of the antitrust laws, defendant eventually succumbed to the Union pressure and issued an ultimatum to plaintiff that plaintiff either restrict its sales to Ozaukee County or plaintiff would be terminated as a distributor of defendant's products. Defendant's notification letter, indicating plaintiff's right to cure, was sent to plaintiff on July 11, 1978, and defendant's termination letter was sent November 15, 1978.

The July 11, 1978 letter indicated that defendant was unhappy with plaintiff's sales in Milwaukee County and gave plaintiff 90 days, as required by the Wisconsin Fair Dealership law, Wisc.Stats. § 135.04, to cure plaintiff's non-compliance. Plaintiff then failed to correct the deficiency by continuing to sell defendant's products in Milwaukee and, therefore, defendant sent plaintiff notice on November 15, 1978 of the termination which was to be effective on November 30, 1978. However, due to this Court's entering a temporary restraining order, this termination has yet to become effective.

Although the facts indicated already show the character of both party's businesses and the pre-existing and potential problems, this Court has yet to discuss a sales competition element that should be mentioned in order to completely set forth the facts already developed by the parties. At times, plaintiff was able to sell defendant's products in Milwaukee County for less money than city sales was selling the products. Thus, at times, plaintiff was able to increase its sales and cut into the sales of defendant's drivers. This pressure on the sales of defendant's drivers angered them to the point that in 1978, the drivers threatened to strike if plaintiff's sales were not restricted.

The question presently pending in this case, which must be considered in light of the foregoing findings of fact, is whether plaintiff is entitled to a preliminary injunction enjoining defendant from terminating plaintiff's distributorship of defendant's products.

■ In order to grant a preliminary injunction, four prerequisites must be met: (1) plaintiff must show that he has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (2) that the plaintiff has a reasonable likelihood of success on the merits; (3) that in granting the preliminary injunction, the Court will not disserve the public interest; and (4) that any threatened injury to the plaintiff outweighs the injury the injunction may cause the defendant. *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products*, 545 F.2d 1096 (7th Cir. 1976). Furthermore, plaintiff has the burden of persuasion on all of these prerequisites. *Id.*

Although *Fox Valley* is the touchstone used by courts in this circuit for determining whether a party is entitled to a preliminary injunction, the Seventh Circuit Court of Appeals has further elaborated on the preliminary injunction prerequisites in order for the district courts to accommodate both the demands of complex litigation and the case where the impending injury is great. In the case of *Mullis v. Arco Petroleum Corporation*, 502 F.2d 290, 293 (7th Cir. 1974), the court stated that "the requirement of a 'reasonable likelihood of success' is necessarily a somewhat flexible standard that allows the chancellor room for the exercise of judgment." In a case such as the present one, if this Court does not enter an order preserving the status quo, there is a very real likelihood that plaintiff's business will be destroyed during the pendency of the litigation. In addressing the somewhat more liberal standard to be applied in cases of great impending injury, the court in *Mullis* still held "at the very least, however, plaintiff must demonstrate that his claims are 'so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Id.* at 293. In the case of *Fenal v. Butler*, 570 F.2d 263 (8th Cir. 1978), the court set forth an alternative standard for granting preliminary relief stating that preliminary relief should be granted when there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 264.

As indicated by the cases cited above, it is this Court's opinion that the two elements of the *Fox Valley* four-prong test pertinent to this case are numbers two and four. That is, whether plaintiff has shown a reasonable likelihood of success on the merits and whether the threatened injury to plaintiff if the injunction does not issue outweighs the potential injury to defendant if it does issue. As to this latter question, in light of the *Fenal* case, this Court is satisfied that the injury to plaintiff in the way of a destroyed business, which is a distinct possibility, is more serious than the injury that defendant may suffer during the pendency of this action.

Thus, for purposes of plaintiff's motion, this Court is left with determining whether plaintiff has established a reasonable likelihood of success on the merits considering that this standard is flexible as indicated by the court in *Mullis*. Even with this flexibility, plaintiff here must still make some

1306

showing at this stage of the proceedings that the claims presented are a fair ground for litigation.

In light of the evidence presented at the evidentiary hearing and considering the legal arguments raised by defendant, it is this Court's considered opinion that plaintiff's motion for a preliminary injunction must be denied. It is clear, in light of the present record in this case, that an analysis of the legality of plaintiff's termination vis-a-vis the federal antitrust laws, necessarily involves a two-step process. There is substantial evidence in this case indicating that defendant has experienced labor problems and that, at times, these problems focused upon plaintiff's competition with defendant's city sales office. The labor law problems cause this Court to treat this case on a two-step analysis. First, the Court must consider whether defendant's attempts at territorial limitation and resulting notice of termination for non-compliance violate the antitrust laws. Having made this determination, then this Court must determine whether defendant is entitled to a labor law exemption from the antitrust laws.

Plaintiff claims that the territorial restraining created by Pabst Brewing Company in limiting the territories in which distributors can sell, in plaintiff's case, Ozaukee County, is an illegal restraint of trade in certain circumstances. The most significant case in this area is the Supreme Court's opinion in the case of *Continental T.V. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In that case, the court held that vertical restraints (*i. e.*, territorial restraints) are not, per se, illegal as the court had originally stated in *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), but, instead, "must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing." *Id.* 433 U.S. at 58, 97 S.Ct. at 2562. The result of *Continental T. V.* is basically to return to the rule of reason analysis that governed vertical restraint cases, such as the present case, before *Schwinn*.

It is important to note that, in *Continental T. V.*, the court was dealing with non-price vertical restrictions and noted in a footnote that "the *per se* illegality of price restrictions has been established firmly for many years and involves significantly different questions of analysis and policy." *Id.* at 2557–58 n.18. Presumably, the court's holding in *Albrecht v. Herald Company*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) would still hold true. There the court held that in cases involving Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), as here, "resale price fixing is a *per se* violation of the law whether done by agreement or combination." *Id.* at 151, 88 S.Ct. at 872. Although such activity is per se illegal, this Court finds no showing of this on the evidence already before the Court, save defendant's setting of prices in city sales, and further, plaintiff has not even asserted a claim based upon price fixing in its pleadings, which apparently attack defendant's territorial restraint. Therefore, for purposes of plaintiff's motion for a preliminary injunction, this Court can not rely upon a claim of price fixing to bring this case into the per se violation category. Such a violation would, however, lessen plaintiff's burden and would indeed be advantageous to plaintiff, if in fact shown.

Therefore, before a plaintiff can recover against a company for limiting the territories by which its retailers or distributors can sell, the plaintiff must show that the action has resulted in an unreasonable restraint of trade. In other words, the plaintiff must overcome the rule of reason test. Absent some highly technical expert testimony, however, it is very difficult for a court to assess whether or not the territorial restraints set by defendant resulted in an unreasonable restraint of trade. This creates a real difficulty for a court in terms of assessing whether there is a reasonable likelihood of success on the merits. To overcome such a problem, as indicated earlier, it is possible for this Court to use the liberal test created for cases which present complex and difficult issues. *Mullis, supra.* The difficulty with such an analysis is that the labor law exemption aspect must be

ground into this Court's determination of plaintiff's likelihood of success on the merits.

In reviewing the evidence presented at the evidentiary hearing, this Court finds that many of defendant's employees are represented by a labor Union, namely, the Brewery Workers Local Union 9, and that this labor Union has a CBA with defendant. Furthermore, among the employees represented by the Union are the helpers and drivers who deliver beer for the defendant's city sales office.

This Court further finds that it is the Union's understanding that these drivers and helpers have exclusive rights to deliver beer for defendant's city sales office in Milwaukee County and that plaintiff's sales in Milwaukee County are an encroachment upon these employees' rights under the CBA. Furthermore, the evidence as accepted by this Court, for purposes of plaintiff's motion, indicates that the Union has placed pressure upon defendant, such pressure being directed towards defendant forcing plaintiff to stop selling defendant's products in Milwaukee County.

In further considering the evidence now before the Court, this Court finds that defendant's business has been decreasing due to increased competition and, that due to this decrease, the Union is sensitive to loss of jobs. In addition, defendant has suffered two walk-outs already this year, 1978, and is quite fearful of another walkout that would cut defendant's production and further decrease defendant's share of the market. The facts as found by this Court indicate that, if defendant did not stop plaintiff's sales incursions into Milwaukee County, the Union drivers and helpers would stage a walk-out and, possibly, employees from other departments would join in the drivers' and helpers' walk-out against defendant.

This Court would further note from reviewing the evidence that, although the Milwaukee city sales office was profitable for defendant, this office was not as profitable as sales to distributors, and further, that if defendant were at liberty to close the city sales office, defendant would do so and assign the Milwaukee County sales to a distributor. However, since the Union considers the drivers' and helpers' jobs important, defendant is not at liberty to make such a move.

In light of these facts, this Court must determine the nature and extent of the antitrust exemption available to an employer, as opposed to the Union, and whether such exemption likely applies in this case. Although this Court cannot determine whether the antitrust exemption applies here, in light of the limited nature of the evidence, this Court must make its evaluation based upon the question of whether plaintiff has made a showing of a reasonable likelihood of success on the merits in light of defendant's reliance on the antitrust exemption.

In one of the earliest Supreme Court cases discussing the labor law exemption as applied to labor unions, *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the court stated: "whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct." *Id.* at 231, 61 S.Ct. at 466. Specifically, the Norris-La-Guardia Act was passed by Congress to accomplish what section 20 of the Clayton Act attempted to do originally, but was unduly restricted by the court in interpretations. *Id.* at 236, 61 S.Ct. 463. Section 6 of the Clayton Act, 15 U.S.C. § 17, provides:

The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to

be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

Thus, in *United States v. Hutcheson, supra*, the court broadly interpreted the labor law exemption in light of the Norris-La-Guardia Act as it modified the Clayton Act. However, in addition to this broad statutory exemption, the courts have evolved a non-statutory exemption "to give assent to joint activity by labor and non-labor parties where considerations of the national labor policy outweigh those of the national antitrust policy." *Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, [¶ 62,184]. Trade Reg.Rep. (CCH) at 75,295 (3rd Cir. 1978). This non-statutory exemption has been considered and refined in a series of United States Supreme Court cases.

In *Allen Bradley Co. v. Union*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the court considered an agreement between a labor union and certain electrical equipment manufacturers which had excluded Allen Bradley and others from selling their wares in New York City. The question presented to the Court there was whether:

> [I]t is a violation of the Sherman Antitrust Act for labor unions and their members, prompted by a desire to get and hold jobs for themselves at good wages and under high working standards, to combine with employers and with manufacturers of goods to restrain competition in, and to monopolize the marketing of, such goods. *Id.* at 798, 65 S.Ct. at 1534.

The court said that it was a violation stating "we think Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services." *Id.* at 808, 65 S.Ct. at 1539. The key element in *Allen Bradley, supra*, was the union's participation with "a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation . . . not included within the exemptions of the Clayton and Norris-La Guardia Acts." *Id.*

at 809, 65 S.Ct. at 1540. The court felt that had the union acted alone to reach its goal of job protection, the union's activity would have been exempted. *Id.* at 811, 65 S.Ct. 1533.

The court further elaborated upon the non-statutory exemption in *Local Union No. 189 v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) in which the court considered union activities which forced all supermarket companies in the Chicago metropolitan area to sell cut meats at meat counters only during limited hours when butchers were on duty, even though the grocers were open for longer periods of time. Jewel was forced to sign a labor agreement, under protest, in which it agreed not to keep its meat counters open when the butchers were not on duty, even though the meat was already cut. In discussing the applicability of the labor law exemption, the Court held:

> [W]e think that the particular hours of the day and the particular days of the week during which employees shall be required to work are subjects well within the realm of "wages, hours, and other terms and conditions of employment" about which employers and unions must bargain. . . . And, although the effect on competition is apparent and real, perhaps more so than in the case of the wage agreement, the concern of the union members is immediate and direct. Weighing the respective interests involved, we think the national labor policy expressed in the National Labor Relations Act places beyond the reach of the Sherman Act union-employer agreements on when, as well as how long, employees must work. An agreement on these subjects between the union and the employers in a bargaining unit is not illegal under the Sherman Act, nor is the union's unilateral demand for the same contract of other employers in the industry. [citations omitted] *Id.* at 691, 85 S.Ct. at 1602.

The Court considered the important aspect in that case to be that the longer sales hours would work a hardship on union

members, and as such was a vital interest the Union could justifiably vindicate. The absence of such justifiable union interests would then render the union's exemption from the Sherman Act unavailable. *Id.* at 693, 85 S.Ct. 1596. This non-statutory labor exemption was further clarified by the Supreme Court in 1975.

In *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the court considered union activity which, although done in the interest of the labor union members, nevertheless overstepped the bounds of the labor unions' antitrust exemption. In *Connell*, the unions had CBA's with certain mechanical subcontractors, but sought to unionize all of the subcontractors in the Dallas vicinity.

Although the union's goal was legal and a justifiable labor objective, the methods used by the union and the eventual results obtained constituted an unreasonable restraint of trade. In *Connell, supra*, the union attempted "to compel the general contractors to agree that in letting subcontracts for mechanical work they would deal only with firms that were parties to the union's current collective-bargaining agreement." *Id.* at 618–19, 95 S.Ct. at 1833. The problem with the union's activities was that it did not have CBA's with the contractors, nor was it attempting to unionize the contractors, and thus the union exercised direct restraint on the business market. By forcing the contractors to do business only with those subcontractors who had CBA's with the union, the effect was to shelter the subcontractors from outside competition, which was an illegal direct restraint on business. The Court held that such restraint "contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore [the union] cannot claim a nonstatutory exemption from the antitrust laws." *Connell*, 421 U.S. at 625, 95 S.Ct. at 1836.

The *Connell* case, and its impact on the labor law exemption in cases such as the one presently before this Court, was discussed in *Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Construction Trades Council, supra*. There the court discussed whether a restaurant chain forced by labor unions to deal only with subcontractors who had CBA's with the union could rely on the non-statutory labor law exemption to the antitrust laws. In *Muko*, Long John Silver's Inc., one of the defendants, originally granted contracts to build its restaurants in the Pittsburgh, Pennsylvania area to the lowest bidder. Muko was the first contractor to be hired to build the restaurants. During construction, the unions picketed the job site and when the restaurant was opened, the unions distributed handbills informing the customers that the owner hired contractors that paid substandard wages.

In order to solve this conflict, Long John Silver's set up a meeting with the unions and, after negotiations, Long John Silver's sent a letter to the unions indicating its intent to hire only union contractors. Although Long John Silver's never entered into a contract, as in *Connell*, the companies next twelve restaurants were built exclusively by union contractors. Muko was offered the opportunity to employ union craftsmen, but refused and, therefore, Muko was not permitted to submit bids on later jobs.

In *Muko*, the court carefully analyzed *Connell, supra*, and distinguished *Connell* from the facts before the court. In reviewing the Supreme Court's holding, the Third Circuit Court of Appeals held that, in *Connell*, the court was compelled to find the labor law antitrust exemption unavailable because of the presence of three factors. The *Muko* court stated that the three factors were:

> *First*, the agreement indiscriminately forbade the hiring of nonunion subcontracting firms, even if a firm's competitive advantage derived from efficiency and not from substandard wages or working conditions. *Second*, only those subcontractors which were parties to current contracts with Local 100 could be hired, an arrangement allowing the union to manipulate the subcontractor market by

agreeing or refusing to contract with any firm it might choose. *Third*, the union was party to a multiemployer bargaining agreement that contained a "most favored nation" clause, a provision in some construction industry contracts which requires the union to give the signatory employer the benefit of the most favorable terms the union subsequently accords any other employer. The practical effect of this clause is to shelter subcontractors in the association from competition with outside subcontractors in that part of the market covered by subcontracting agreements between general contractors and the union. [¶ 62,184] Trade Reg.Rep. at 75,296.

Although the court in *Muko* found the first *Connell* element present, the court held that the latter two elements were not present. The court held that the plaintiff had not shown, vis-a-vis the second element, an agreement that was comparable to the *Connell* agreements which "did not simply prohibit subcontracting to any nonunion firm; they prohibited subcontracting to any firm that did not have a contract with Local 100." 421 U.S. at 624, 95 S.Ct. at 1836. Thus, the court in *Muko* held that there was "no such comprehensive restraint of an entire industry . . ." there. [¶ 62,184] Trade Reg.Rep. at 75,297. Furthermore, in *Muko*, the third element, *i. e.*, the "most favored nation clause," was absent.

■ A review of the non-statutory labor exemption to the antitrust laws leaves this Court with the difficult task of applying the exemption to the facts in this case. This task is further complicated by the procedural context of this case, wherein this Court must decide whether plaintiff has shown a reasonable likelihood of success on the merits so that it is entitled to a preliminary injunction. In reviewing the facts of the case as the record now stands, this Court is drawn to the conclusion that, even if defendant's termination of plaintiff's distributorship may, standing alone, constitute a violation of the antitrust laws, such actions are shielded by the antitrust exemption.

It is important to note at the outset that, in contrast to *Connell, supra*, the agreement here is between a union and an employer of union members. Under such circumstances, the union has every right to negotiate a contract concerning its members. Furthermore, the privileges and rights contracted for in the CBA between defendant and the union are just the types of provisions mentioned in *Jewel Tea, supra*. Here the union was interested in job protection for members of its union. If plaintiff were permitted to sell in Milwaukee County in competition with the drivers and helpers working in city sales, then, in the union's view, there was a chance that certain jobs would be lost. Here, as in *Jewel Tea*, the limitation imposed upon plaintiff does not stand alone, but rather it is mitigated by the vital interests of the union in job preservation.

This Court would further note that defendant's sales have been decreasing in recent years and this has caused reductions in the Union workforce. Needless to say, the Union is quite concerned about such losses and in such an atmosphere, would be quite concerned with the loss of even one job. The testimony indicates that city sales departments are notoriously inefficient and may bear some of the responsibility of this sales decline nationally. Nonetheless, the facts, as this Court presently finds, indicate that the city sales department here in Milwaukee is profitable; that defendant has undergone labor problems recently because of the impact of plaintiff's activities on the city sales department; and that defendant is justifiably sensitive to any future labor strife.

It is quite clear to this Court for purposes of plaintiff's motion for a preliminary injunction, that in light of the defendant's agreement with the Union, plaintiff is not likely to succeed on the merits in respect to its antitrust claims. Although defendant employer is relying on the labor law exemption, the *Muko, supra*, decision indicates that the labor exemption is also available to non-labor parties under appropriate circumstances. It is this Court's considered opinion that on plaintiff's federal antitrust law

claims, plaintiff has not made a showing of reasonable likelihood of success on the merits.

■ The remainder of the counts asserted by plaintiff are based upon state law. Since both plaintiff and defendant are Wisconsin corporations, jurisdiction over the state claims cannot be grounded on diversity of citizenship. Rather, this Court has the power to hear plaintiff's state claims on the basis of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Defendant argues that this Court cannot base a preliminary injunction on the state claims, if this Court finds that plaintiff is not entitled to a preliminary injunction based on the federal claim. This Court need not reach this question, since it is the Court's opinion that plaintiff has not made a showing of a reasonable likelihood of success on the merits on its state claims.

■ Plaintiff has alleged a violation of Wisconsin Antitrust Law, Wisc.Stat. § 133.-01, by defendant's termination of plaintiff's distributorship. This cause of action cannot be relied upon by plaintiff because the Supreme Court "has held repeatedly that federal law pre-empts state remedies that interfere with federal labor policy . . ." *Connell*, 421 U.S. 635, 95 S.Ct. at 1841. *See, also*, cases cited therein. Therefore, to the extent that this Court has found that defendant's actions are exempt from the federal antitrust laws, such labor law exemption also applies to shield defendant from plaintiff's cause of action based upon state antitrust law. In light of the applicability of the federal labor law exemption to plaintiff's state antitrust law claims, this Court cannot base a preliminary injunction on that cause of action. This, however, leaves consideration of plaintiff's non-antitrust state law claims.

■ In reference to plaintiff's claim based upon the Wisconsin Fair Dealership practices statute, this Court must look at Wisc.Stat. § 135.03. That statute provides that "no grantor, directly or through any officer, agent or employe may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement entered into after the effective date of this act (1973) without good cause." The burden of proving good cause shall be on the grantor. Besides the showing of good cause, the Wisconsin Statutes further set forth a procedure by which a dealer termination is carried out. The applicable procedural statute, Wisc.Stat. § 135.04, provides:

> Except as provided in this statute, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in the competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency. If the deficiency is rectified within 60 days the notice shall be void.

In applying the Wisconsin Fair Dealership laws, this Court finds that the defendant sent plaintiff a letter on July 11, 1978, in which letter the defendant indicated to the plaintiff that it was unhappy with the plaintiff selling beer within the Milwaukee County area. Specifically, defendant states in terms of its dissatisfaction, "The reasons for termination of said distributorship are your continuing refusal to accommodate the operations of your distributorship with the contractual obligations between Pabst Brewing Company and Brewery Workers Local No. 9 which require that all deliveries of beer to retail licensees within the county of Milwaukee shall be made exclusively by the drivers and helpers of the Union." (Exhibit A attached to Plaintiff's Complaint). By such letter, the defendant demanded that Suburban Beverages halt the sale of Pabst products within the Milwaukee County area or, by October 16, 1978, notice of termination would be sent to plaintiff. By letter dated November 15, 1978, defendant notified plaintiff that the dealership agreement would be terminated effective November 30, 1978.

Looking at the letter sent by the defendant to plaintiff notifying plaintiff of the labor problems that plaintiff was causing by delivering beer within the Milwaukee County area and the fact that this appears to this Court at this time to be good cause, this Court is of the opinion that plaintiff has not established a reasonable likelihood of success on the merits which is necessary for this Court to grant a motion for a preliminary injunction. This Court will finally consider plaintiff's cause of action based upon contract as it relates to plaintiff's motion for a preliminary injunction.

According to the agreement between the plaintiff and the defendant, plaintiff was permitted to sell beer only within the county of Ozaukee. However, plaintiff, by its own admission, has been selling defendant's products within the Milwaukee County area. According to the terms of the contract, plaintiff's territory was limited to Ozaukee County and any sales in Milwaukee County were in breach of the contract. Although plaintiff argues that the defendant is breaching the contract by terminating the agreement, this Court is of the opinion that such termination is merely a response to plaintiff's failure to comply with the terms of the distributorship contract. According to Wisconsin law, if a breach of contract is serious enough the non-breaching party can consider the contract repudiated, and presumably, can treat such contract at an end. *Seidling v. Unichem, Inc.,* 52 Wis.2d 552, 191 N.W.2d 205 (1971). This Court is of the opinion that the term of the contract limiting Suburban Beverage's sales to the Ozaukee County area was a material term of the contract. As such, plaintiff's failure to comply with that term in the contract constituted a material breach and thereby entitled defendant to terminate the contract as it has done in this case.

There is a further basis upon which, in this Court's opinion, defendant was justified in terminating the contract. In paragraph 2(a) of a supplemental contract between plaintiff and defendant signed May 11, 1971 by plaintiff's president, Michael Moriarty, defendant can terminate the contract. The requirements of this term of the supplemental contract require that the distributor be given 90 days notice of defendant's dissatisfaction with the distributor, during which time the distributor is permitted to overcome defendant's dissatisfaction. If at the end of such period the distributor has not effectively cured the deficiency, to be determined by the Vice-President of Sales, the defendant can cause notice of termination of the distributor to be delivered not less than seven (7) days prior to the effective date of the termination. (Defendant's Exhibit 10 offered and received at the Evidentiary Hearing).

In reviewing the facts of this case, realizing that this Court is only determining whether plaintiff has shown a reasonable likelihood of success on the merits, this Court finds that defendant's actions comply with the terms of the contract. First, in light of the strong labor pressure and the territorial limitations on plaintiff's sales, defendant appears justified in terminating plaintiff's distributorship. Second, this Court finds that defendant's actions complied with the notice requirements of the contract. Defendant sent plaintiff the first notice on July 11, 1978, more than 90 days prior to the termination notice sent on November 15, 1978. In addition, this notice of termination was sent more than seven days before November 30, 1978, the effective date of plaintiff's termination.

Therefore, this Court hereby finds that plaintiff has not shown a reasonable likelihood of success on the merits on its contract law based claim and as such, this Court is unable to base a preliminary injunction on that cause of action.

In light of the foregoing discussion of the facts and the law applicable thereto, this Court is drawn to the conclusion that plaintiff's motion for a preliminary injunction must be denied. This Court feels compelled to add a postscript to this memorandum of law because of the extensive proceedings that have already taken place. The evidentiary hearing and the extensive facts developed therein were referred to extensively in

this order, and as a matter of necessity, this Court has drawn factual conclusions. Both parties should be aware that this Court has found such facts as are contained in this order solely for the purpose of determining whether plaintiff has shown a reasonable likelihood of success on the merits. This Court is well aware that this is a complicated case and that a complete record would most certainly require more than a few hours of testimony at the evidentiary hearing. Furthermore, this Court is well aware that, by denying plaintiff's motion, plaintiff's business may be destroyed, or at least seriously crippled, and this Court is further aware that, in such circumstances, a somewhat reduced showing of likelihood of success is necessary. Nevertheless, this Court has carefully considered the law and the current record and is therefore drawn to the conclusion that plaintiff has failed to make the necessary showing.

Therefore, this Court finds that plaintiff's motion for a preliminary injunction must be and hereby is DENIED.