**KEALEY PHARMACY & HOME CARE SERVICE, INC.; Dawiedzyk Pharmacy, d/b/a Milton Avenue Pharmacy; Rademacher Drugs, Inc., d/b/a East Troy Drugs; Lake Mills Pharmacy, Inc.; Joseph Jameson, d/b/a Monticello Pharmacy; Philip L. Lutgen, d/b/a Delafield Pharmacy Walgreen Agency; Kunkel Pharmacy, Inc.; Langmack's Inc., d/b/a Langmack's Drugs; D & W Pharmacies, Inc., d/b/a Monona Drive Walgreen Agency; Busse Pharmacy, Inc.; Willis-Lauke, S.C., d/b/a Willis Drug, Plaintiffs,**

v.

**WALGREEN COMPANY, Defendant.**

No. 80–C–522–C.

United States District Court,
W.D. Wisconsin.

April 19, 1984.*

_____

\* This opinion is one year old, and is submitted because of the Seventh Circuit opinion issued in

April, 1985. 761 F.2d 345.

Dennis L. Hansch, Janesville, Wis., for plaintiffs.

H. Dale Peterson, Madison, Wis., and Howard J. Swibel, Arnstein, Gluck & Lehr, Chicago, Ill., for defendant.

## OPINION AND ORDER

CRABB, Chief Judge.

This civil action is before the court after trial to the court on the issue of damages only. In earlier decisions, I denied plaintiffs' motions for preliminary and permanent injunctions prohibiting the termination of their Walgreen dealerships and I granted partial summary judgment to plaintiffs on the issue of defendant's liability for damages resulting from the termination of plaintiffs' Walgreen dealerships. 539 F.Supp. 1357.

From the evidence adduced at the trial, and from the stipulations of the parties, I make the following findings of fact.

## FACTS

Plaintiffs are independently owned drugstores located in southern Wisconsin.

Defendant Walgreen Company is an Illinois corporation with its principal place of business at 200 Wilmot Road, Deerfield, Illinois, 60015. It is engaged in the manufacture and sale of pharmaceuticals, drugs, and toiletries, and also owns and operates drugstores throughout the United States.

Plaintiff Kealey Pharmacy & Home Care Service, Inc. is a 4200 square foot drugstore located in Janesville, a city of 51,100. It was acquired by James Kealey as a Walgreen agency store in May, 1965. When he bought the store, Kealey believed the Walgreen agencyship to be an important factor in the purchase. Before he agreed to the purchase, Kealey checked with both the Walgreen agency representative in the area and with defendant's home office to confirm that the store would remain a Walgreen agency.

Plaintiff Milton Avenue Pharmacy, is a 4,000 square foot drugstore also located in

Janesville. Dennis Dawiedczyk purchased the store in June, 1973, when it was a Walgreen agency. As part of the purchase price, Dawiedczyk paid $10,000 for good will, despite the fact that the store had been losing money.

Plaintiff East Troy Drugs, is a 5000 square foot drugstore located in East Troy, Wisconsin, a town of 2,385. John Rademacher bought the drug store in 1970 when it was a Rexall agency. In 1976 Rademacher moved to a larger store in a shopping center strip mall and signed a retailer's agreement with defendant.

Plaintiff Lake Mills Pharmacy, Inc. is a 1700 square foot drugstore located in Lake Mills, a town of 3,670. Kent Kautzer purchased the store in 1975, when it was an independent store. Kautzer executed a dealership agreement with defendant in November, 1976.

Plaintiff Monticello Pharmacy is a 2300 square foot drugstore located in Monticello, a town of 1,021, about 25 miles away from Madison. Joseph Jameson bought it in February, 1979, three to four months after the store had first opened. Jameson executed a dealership agreement with defendant in June, 1977.

Plaintiff Delafield Pharmacy Walgreen Agency, is a 1700 square foot drugstore located in Delafield, a town of 4,083, on the outskirts of the Milwaukee metropolitan area. Philip Lutgen purchased the store in 1974 when it was a Walgreen agency, paying $10,000 for good will.

Plaintiff Kunkel Pharmacy, Inc. is a 4000 square foot drugstore located in Elkhorn, a town of 4,605. It was purchased as a Walgreen agency by Donald Kunkel in August, 1968. It has been remodeled twice since 1968.

Plaintiff Langmack's Drugs, is a 5000 square foot drugstore located in Beaver Dam, a city of 14,100. It was purchased as a Walgreen agency store in 1963 by Carl Johnson.

Plaintiff Monona Drive Walgreen Agency, is a 3000 square foot drugstore located in Monona, a town of 8,809, bordering Madison. It was purchased as an independent store by Dennis Dawiedczyk in 1978. Dawiedczyk signed a retailer's agreement with defendant in October, 1978.

Plaintiff Busse Pharmacy, Inc. is a 5000 square foot drugstore located in Watertown, a city of 18,100. Busse was purchased as a Walgreen agency by Alfred Shumaker in 1978. In 1976, when Shumaker was a part owner, the store was remodeled and doubled in size.

Plaintiff Willis Drug, is a 4000 square foot drugstore located in Evansville, a town of 7,835. The store was established in 1956 by Arnold Willis. It was moved across the street to its present location in 1979, the same year in which plaintiff became a Walgreen agency store. The move enabled the store to expand from 1200 square feet to its present size.

In April of 1980, defendant decided to terminate its entire Agency Division nationwide because of unsatisfactory financial performance. Defendant sent letters to plaintiffs informing them of the decision and advising them that their dealership agreements would be terminated effective October 1, 1980.

Defendant's Agency Division had serviced its agency stores, including plaintiffs, by assisting their owners with inventory, advertising, promotion, store layout, advertising, and other aspects of drugstore operation. Defendant employed agency representatives who solicited drugstore owners to affiliate with defendant. In 1978, for example, a Walgreen agency representative met with Arnold Willis to encourage him to make the Willis Drug Store in Evansville a Walgreen agency store. In early 1979, Willis and his partner traveled with the agency representative to defendant's headquarters in Deerfield, Illinois, where they met with Walgreen officials. Defendant's employees provided Willis with plans and blueprints for remodeling the newly-acquired building to make it look like the prototypical Walgreen drugstore and they took him and his partner to two Walgreen stores in the Chicago area to show them the newest Walgreen look and layout. De-

fendant projected plaintiff's first year sales in the new building as $390,000, second year sales as $475,000, and third year sales as $550,000. In fact, plaintiff's first year sales (for the year ending June 30, 1980) were $382,000, its second year sales were $443,000 (for the year ending June 30, 1981), and its third year sales (for the year ending June 30, 1982) were $471,000.

Under the dealership agreements plaintiffs had with defendant they were able to purchase merchandise from defendant and to designate their stores as Walgreen agencies. The agreements did not require plaintiffs to make an initial payment of a fee to defendant in order to become Walgreen agents. Plaintiffs paid money to defendant only as payment for merchandise or adver-

tising materials which plaintiffs chose to purchase from defendant. The dealership agreements provided for nonexclusive territorial arrangements with defendant, which permitted the existence of Walgreen company-owned stores and other Walgreen agents in plaintiffs' trading areas.

Although the dealership agreements required plaintiffs to purchase various minimum annual amounts from defendant, plaintiffs did not purchase such minimum annual amounts, and defendant made no effort to enforce the minimum purchase requirements. The following chart shows the percentage of their total cost of purchases represented by the purchases plaintiffs made from defendant from 1975 to September, 1980:

|  | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|---|---|
| Kealey | 11.1 ($34,774) | 10.3 ($31,086) | 9.4 ($29,878) | 9.4 ($28,446) | 8.8 ($29,875) | — ($8,697) |
| Milton Ave | 9.8 ($22,213) | 7.9 ($21,573) | 7.6 ($24,921) | 7.3 ($25,920) | 10.1 ($32,891) | — ($6,090) |
| East Troy | — | 4.6 ($8,662) | 5.4 ($12,973) | 6.3 ($19,207) | 9.9 ($31,776) | — ($6,838) |
| Lake Mills | — | — | 9.6 ($12,195) | 10.8 ($16,481) | 15.8 ($25,616) | — ($13,309) |
| Monticello | — | — | — | 12.8 ($10,275) | 16.1 ($14,172) | — ($2,100) |
| Delafield | 4.9 ($7,170) | 6.3 ($10,077) | 6.4 ($11,334) | 8.5 ($16,696) | 8.7 ($18,289) | — ($4,895) |
| Kunkel | 6.4 ($18,248) | 6.5 ($20,556) | 7.5 ($22,281) | 8.5 ($29,124) | 8.2 ($31,297) | — ($15,270) |
| Monona Dr. | — | — | — | — | — ($15,054) | — ($4,129) |
| Langmacks | 3.6 ($10,903) | 3.7 ($11,176) | 4.5 ($11,991) | 4.8 ($17,780) | 7.6 ($21,162) | — ($11,880) |
| Busse | 8.6 ($26,510) | 5.8 ($19,257) | 3.5 ($11,164) | 3.0 ($10,881) | 6.4 ($24,799) | — ($10,917) |
| Willis | — | — | — | — | 13.7 ($29,000) | — ($3,820) |

NOTE: The total cost of purchases would include the cost of prescription drugs, which defendant did not sell to plaintiffs.

---

Defendant's agency representatives told the agency store owners that the secret to a successful drugstore operation was a five-part program: advertising, Walgreen products, store planning, display, and mer-

chandising. Defendant believed, and told its agency store owners, that the Walgreen name on a sign outside the store had strong drawing power for transient traffic.

Defendant supplied its agency stores with both Walgreen branded products and with products of other manufacturers which were "drop shipped" to the stores. The agency stores usually added a fifty percent markup on the Walgreen products and twenty-five to forty percent markup on the drop-shipped items. The stores were free to set any prices they wished on the items they sold, whether they were Walgreen-branded products or nationally-advertised products. Ordinarily, an agency store owner could sell the Walgreen products for less than similar nationally-advertised products even with a fifty percent markup in the price. On certain yearly promotions of Walgreen vitamins, the owner could sell the vitamins at a competitive price with a one hundred percent markup. Defendants' agency representatives encouraged the agency store owners to sell more CRW (Walgreen-branded) products by integrating them with other products.

The agency representatives never attempted to enforce the minimum purchase requirements contained in the Retailers Agreements. Such purchases were encouraged by the competitive pricing of the Walgreen products, the special promotions of certain products, and the representative's demonstrations of the merchandising advantages of integrating the Walgreen products with the nationally-advertised brands to highlight the lower prices of the Walgreen items.

No other drugstore chain in the Midwest provides agency services to independently owned drugstores as defendant did through its agency division. The only drugstore chain that will sell to independently-owned drugstores is Snyder's, a chain with headquarters in Minneapolis, Minnesota. Snyder's is not well known in Wisconsin and does not provide the level of services defendant provided its agency stores.

Since their termination as Walgreen agency stores, plaintiffs Kealey and Milton Ave. have become affiliated with Family Drug Voluntary, a buying cooperative made up of about forty independent pharmacies under the sponsorship of the Zahn Drug chain. The cost of membership is $290 a month.

Plaintiff Delafield Pharmacy tried a one year affiliation with Valu-Rite Pharmacies, a division of McKesson, but found it unsatisfactory. Plaintiff Busse Pharmacy also had an affiliation with Valu-Rite, begun prior to its termination as an agency store. Plaintiff Busse discontinued this affiliation in December, 1981.

None of the other plaintiffs has affiliated with any organization or chain of drugstores since the termination by defendant of its agency division.

As Walgreen agency stores, all of the plaintiffs enjoyed the image of low price and good value to the consumer, the benefits of the use of the Walgreen logo, the assistance of the agency representative in merchandising and store layout, and the availability of advertising and promotional materials.

In the tourist areas of southern Wisconsin, such as East Troy and Lake Mills, the Walgreen name attracts visitors from Illinois who are familiar with the Walgreen name, logo, and products. In the small towns where many of the plaintiff stores are located, the plaintiffs benefited from their affiliation with defendant because the Walgreen image of value and low prices offset the usual perception that a store with a captive audience can charge whatever prices it wishes.

During the time they were Walgreen agencies, the plaintiff stores promoted the Walgreen name, image, and reputation in their communities. For example, although they could not purchase prescription drugs from defendant, all of the prescription drugs they sold promoted the Walgreen name because the prescription labels included the words, "Walgreen Agency."

For a time after termination, customers continued to think of the plaintiff stores as Walgreen agencies and would bring Walgreen promotional coupons in for redemption, only to be told that they would have to go to a Walgreen-owned store instead.

**160**

Following termination, plaintiffs experienced difficulties in ordering the kinds of sundries they had previously ordered from defendant. They found it difficult to locate distributors of such goods that were willing to sell to plaintiffs in small quantities, and to meet the new and varied credit requirements of the sources they were able to locate. Plaintiffs were unable to purchase CRW products from anyone.

None of the plaintiffs has ever had a prescription optical department, and none of the plaintiffs has ever sold liquor or provided food services. Each of the plaintiffs purchased merchandise from many suppliers other than defendant both before and after the termination.

From time to time, both before and after termination, plaintiffs, independently of each other, have made changes in the merchandise mix and brand labels carried in their stores; have made changes in the kind and level of their advertising expenditures; have participated in promotional campaigns; and have changed their pricing practices.

Both from a sales and profit perspective, the success of plaintiffs' stores depends on a number of factors. These factors include plaintiffs' management, pricing policies, advertising, location, size of store, hours of store, services provided by store, merchandise mix and type, the population of the town in which the store is located, the number of pharmacies and other competitors in the store's trading area, as well as numerous other factors.

With the exception of Kealey Pharmacy and Milton Avenue Pharmacy, which are both in Janesville, each plaintiff is located in a different town, and each plaintiff faces competitive factors and environments that are different from those faced by the other plaintiffs. Many of the areas in which the plaintiff stores are located have experienced particularly adverse effects from the national economic recession.

The nature and identity of each plaintiff's competitors changes from time to time. The success of a retail drug store depends to a great extent upon the competition that it faces.

Since 1980, defendant has made major increases in its expenditures for advertising in newspapers and on radio and television. Some of this increased advertising has been in areas where plaintiff stores are located.

During the term of the dealership agreements, defendant supplied various Walgreen branded products to plaintiffs. Upon termination, defendant refused to repurchase from the plaintiffs all inventories and merchandise with the Walgreen name or trademark. In selling this inventory, plaintiffs incurred losses as shown below.

| | Stipulated Whole Cost of Initial Inventory | Doubled for Retail Less 9.4% Profit Factor | Less Amount Recouped Through Sale | Damages |
|---|---|---|---|---|
| Kealey | $3,480.00 | $ 6,305.00 | $1,680.00 | $ 4,625.00 |
| Milton Ave | 9,600.00 | 17,395.00 | 7,000.00 | 10,395.00 |
| Monona Dr. | 900.00 | 1,630.00 | 250.00 | 1,380.00 |
| East Troy | 2,600.00 | 4,711.00 | 450.00 | 4,261.00 |
| Lake Mills | 4,250.00 | 7,701.00 | 2,750.00 | 4,951.00 |
| Monticello | | | | 992.00* |
| Delafield | 3,000.00 | 5,436.00 | 500.00 | 4,936.00 |
| Kunkel | 8,000.00 | 14,496.00 | 5,000.00 | 9,496.00 |
| Langmacks | 4,000.00 | 7,248.00 | 600.00 | 6,648.00 |
| Busse | | | | 1,995.00* |
| Willis | 5,000.00 | 7,880.00 | 2,500.00 | 5,380.00 |
| | | | | $55,020.00 |

* Damages stipulated to by parties prior to trial.

Also, plaintiffs incurred damages for removal of their Walgreen signs, for unused sales aids and promotion materials, and conversion expenses as set forth below:

|  | Sign Removal | Sales Aides and Promotional Materials | Conversion Expenses | Subtotal |
|---|---|---|---|---|
| Kealey | $1,906.32 | No claim | $1,668.00 | $3,574.32 |
| Milton Ave | 1,402.00 | 215.00 | 1,000.00 | 2,617.00 |
| Monona Dr. | 447.20 | 100.00 | No claim | 602.20 |
| East Troy | 390.00 | 250.00 | 2,245.00 | 2,735.00 |
| Lake Mills | 836.64 | 400.00 | 500.00 | 1,736.64 |
| Monticello | 400.00 | 100.00 | 400.00 | 900.00 |
| Delafield | 544.96 | 275.00 | 1,072.00 | 1,891.96 |
| Kunkel | 1,250.00 | No claim | 500.00 | 1,750.00 |
| Langmacks | 181.54 | 400.00 | 800.00 | 1,381.54 |
| Busse | 291.20 | No claim | 1,220.00 | 1,511.20 |
| Willis | 987.00 | 200.00 | 600.00 | 1,787.00 |

Paragraph 4(c) of plaintiffs' dealership agreements provides that in the event of termination, plaintiffs may recover from defendant "an amount of cash equal to one-half of Dealer's purchases of Walgreen products during the twelve month period immediately preceding the effective date of such cancellation or termination." The amount of cash equal to one-half of plaintiffs' purchases of Walgreen products during such twelve month period is as follows:

| Busse Pharmacy | $3,424.50 |
|---|---|
| Delafield Pharmacy | 1,497.00 |
| East Troy Drugs | 2,683.50 |
| Kunkel Pharmacy | 3,785.50 |
| Kealey Pharmacy | 2,628.50 |
| Lake Mills Pharmacy | 1,051.50 |
| Langmacks, Inc. | 2,482.00 |
| Milton Ave. Pharmacy | 2,581.50 |
| Monona Drive Pharmacy | 788.00 |
| Monticello Pharmacy | 201.50 |
| Willis Drug | 606.00 |

Defendant has delivered to plaintiffs' stores various goods which were accepted by plaintiffs. The following amounts are due defendant for the goods which were delivered:

| Kealey Pharmacy | $3,607.00 |
|---|---|
| Milton Ave. Pharmacy | 2,066.00 |
| Monona Dr. Pharmacy | 1,800.00 |
| East Troy Drugs | 2,190.00 |
| Lake Mills Pharmacy | 1,500.00 |
| Monticello Pharmacy | 2,317.00 |
| Delafield Pharmacy | 3,750.00 |
| Kunkel Pharmacy | 6,048.00 |
| Langmack's Drugs | 1,225.00 |
| Busse Pharmacy | 3,235.00 |
| Willis Drug | 2,126.00 |

Prior to the effective date of termination (October 1, 1980), plaintiffs had actual knowledge that their dealership agreements required them to remove their Walgreen signs, and that they would face a penalty of $500.00 per month for each month after the termination that they did not remove their Walgreen signs. Paragraph 6 of plaintiffs' dealership agreements provided:

In the event of the cancellation or termination of this Agreement, Retailer agrees to pay Walgreen the sum of $500 per month for each month following said cancellation or termination during which Retailer maintains signs or other adver-

tising matter designating Retailer as a distributor of Walgreen products.

Seven of the plaintiffs did not remove their signs for more than one month after termination, as shown below:

|  | Sign Removed |
|---|---|
| Monona Drive Pharmacy | May, 1981 |
| East Troy Drugs | January, 1981 |
| Delafield Pharmacy | January, 1981 |
| Langmack's Drugs | June, 1982 |
| Willis Drug | August, 1982 |
| Kealey Pharmacy | March, 1981 |
| Busse Pharmacy | November, 1980 |

Nothing prevented any of these seven plaintiffs from removing their Walgreen signs prior to October 1, 1980. It was the plaintiffs' own choice not to remove their signs at that time.

Prior to termination, plaintiff Milton Avenue Pharmacy had two large signs: a free-standing one in front of the store that read "Milton Ave. Walgreen Drugs" and another one affixed to the side of the store that read "Walgreen Agency." In September, 1980, plaintiff had the word Walgreen in the free-standing sign painted over, leaving a blank white stripe between the words "Milton Ave." and "Drugs," and had the word Walgreen on the other sign scraped off the sign, leaving only the word "Agency" in the lower right hand corner of an otherwise blank white oval.

As a result of defendant's termination of its dealership, each of the plaintiffs has incurred costs in bringing this lawsuit. Such costs include actual attorneys' fees of $75,407, and expenses of expert witnesses, deposition costs, and other disbursements connected with the lawsuit in the amount of $15,428.

Following its termination as an agency store, plaintiff Kealey Pharmacy had an eleven percent increase in gross sales. James Kealey attributes this increase to increases in the sales of durable medical equipment for the home care market and to a rise in the volume of prescription sales. Between October, 1980 and October, 1983, the percentage of sales of prescriptions and durable medical equipment increased and the percentage of sales of sundries decreased.

Since termination, plaintiff Milton Ave. Pharmacy has experienced an increase in the percentage of prescription sales in proportion to its total business, although the total number of prescriptions written has not changed significantly. Overall, plaintiff's gross sales have increased since 1980.

Following termination, plaintiff East Troy Drugs' sales of sundries decreased from $122,295 in 1980 to $100,931 in 1982, although the store's gross sales increased overall.

In the year following termination, plaintiff Lake Mills Pharmacy's gross sales increased $10,000. In the second year following termination, plaintiff's gross sales increased by $29,000. Of the $39,000 increase, $35,000 was attributable to an increase in prescription sales. Sales of sundries and non-prescription drugs grew at a lower rate than they had been growing prior to termination.

During plaintiff Monticello Pharmacy's first full year in business in 1978, 42 percent of its business was in sales of prescription drugs. In 1983, this percentage had grown to almost 65 percent. In 1982, plaintiff's gross sales declined, despite an increase in prescription sales.

From 1975 through 1980 plaintiff Delafield Pharmacy's gross sales increased each year. In 1981, the first full year following plaintiff's termination as an agency store, gross sales dropped from almost $300,000 to $285,000. In 1982, plaintiff's gross sales dropped to $254,000. However, from 1980 through 1982, plaintiff's prescription sales increased from $97,000 to $112,000. The percentage of prescription sales of prescription drugs to gross sales has increased every year since 1975.

From 1973 to the present, plaintiff Kunkel Pharmacy has shown an annual increase in gross sales. Donald Kunkel attributes the increase in 1981 and 1982 to the growth

of the population in the Elkhorn area and to his acquisition of drug service contracts with two area nursing homes.

From 1973 to 1981, plaintiff Langmack's Drugs' gross sales were either steady or in a slight decline. In 1981, plaintiff's gross sales declined by $25,000 to $378,000. In 1983 they increased dramatically to $519,-000. Johnson attributes the 1982 increase to the bankruptcy of plaintiff's nearest competitor and plaintiff's subsequent acquisition of the competitor's prescription files. With the new business, prescription sales went up by $95,000.

Following its termination as an agency store, plaintiff Monona Drive's gross sales increased 38 percent (or about $50,000) in 1981 and 15 percent in 1982.

Plaintiff Busse Pharmacy's gross sales declined from 1975 to 1976, but increased steadily in 1977, 1978, and 1979. However, in the fiscal year ending June 30, 1981, its gross sales dropped from $598,000 to $500,-000. In the fiscal year ending June 30, 1982, sales went up about $13,000, but prescription sales went up by $23,000. In the fiscal year ending June 30, 1983, gross sales went up 9.19 percent, to $561,000.

Their terminations as agencies were the substantial cause of the damages plaintiffs suffered in the form of lost future profits, losses on sales of Walgreen brand inventory, and on sales aids and promotional items, costs of sign removal, and attorneys' fees and costs of litigation. Such damages arose naturally as a result of defendant's illegal termination of its dealership agreements and are those that would be reasonably contemplated by the parties at the time they made their agreements the parties would have reasonably anticipated would be the probable result of a breach.

Donald Nichols analyzed plaintiffs' claims for lost future profits. Nichols is chairman of the department of economics at the University of Wisconsin-Madison; he has served as deputy assistant Secretary of Labor, and he has appeared as an expert witness on the issue of lost future profits in two other fair dealership cases tried in the United States District Court for the Eastern District of Wisconsin.

Nichols found that six of the plaintiff stores had enough financial data to permit an evaluation of their performance for the years 1975 through 1982. Nichols compared this six-store group to a group of 29 Walgreen-owned stores located in Wisconsin for which similar financial data was available. From the tax returns of the plaintiff stores, Nichols allocated their costs into two categories, fixed and variable, in order to determine a variable profit rate which he estimated to be 9.4 percent.

During the five year period prior to 1980, the group of plaintiff stores grew at a rate essentially identical to that of the group of defendant's company-owned stores (6.5 percent annual growth in gross sales compared to 6.6 percent). However, in the first two full years following their termination as agency stores, the plaintiff stores grew at a rate four percent less than the rate at which the defendant's stores grew. The average annual rate of sales growth for the plaintiff stores in 1981 and 1982 was 3.9 percent. For the company-owned stores, the average annual rate of growth in this two year period was 7.9 percent.

The normal life of a franchise similar to those of the plaintiff stores is twenty years.

Projecting a one year, four percent decline in rate of increase of gross sales over the twenty year life of the plaintiff stores, using a real interest rate of three percent ("real interest" being the difference between the nominal interest rate and the rate of inflation), produces a present value of lost sales for the eleven plaintiff stores of $3,237,872. If these sales had not been lost, plaintiffs would have made a profit on them. Multiplying the present value of the lost sales by plaintiffs' variable profit rate of 9.4 percent produces a loss of future profits for the eleven plaintiffs of $295,000.

If the average annual loss of increase of four percent observed in the first two years following termination is projected to occur every year for twenty years, plain-

tiffs' loss of future profits, reduced to present value, would be $2,250,000.

Use of an asymptotic method of predicting future lost profits produces a final computation of loss of future profits of approximately $1,000,000.

During the period studied, 1975–1982, the only factor common to the stores' performances was the termination of plaintiffs as Walgreen agencies.

## OPINION

■ Before discussing the assessment and calculation of damages, I must address defendant's contention that the plaintiffs were not "dealers" as that term is defined in the Wisconsin Fair Dealership Law. Defendant raised this issue for the first time at the trial on damages. Until then, the case had proceeded on the uncontested assumption that plaintiffs were dealers within the meaning of the Act. In its arguments in opposition to plaintiffs' motions for injunctive relief and in support of its own motion for summary judgment, defendant had argued that the provisions of the fair dealership act did not apply to an across-the-board termination of all dealerships, but had never raised the contention that plaintiffs were not dealers.

Defendant cited an opinion of the Court of Appeals for the Seventh Circuit, *Wilburn v. Jack Cartwright, Inc.,* 719 F.2d 262 (7th Cir.1983), released the week before trial began in this case. In *Wilburn,* the court of appeals concluded that the Wisconsin Fair Dealership Law was not intended to cover a manufacturer's representative who promoted the manufacturer's products, solicited orders, and assisted buyers with filling out the order forms, but who paid no franchise fee, incurred no capital expense in undertaking to represent the manufacturer, maintained no showroom, had no office outside his home, was not required to do any advertising, did no selling from inventory, had no authority to accept orders, did not bill customers or participate in collections, and did not extend credit or assume any risk of late payment or nonpayment.

The court of appeals' decision was based upon a decision by the Supreme Court for the State of Wisconsin, *Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 313 N.W.2d 60 (1981), in which the state court had held that the protections of the Wisconsin Fair Dealership Law did not extend to a manufacturer's representative who paid no dealership fee to the manufacturer, was not required to maintain an inventory of the manufacturer's products, and left to the manufacturer the tasks of estimating, quoting, accepting, and rejecting orders, shipping, negotiating the terms of sales and credit arrangements, assuming credit risks, and collecting delinquent payments.

In holding that Foerster, Inc. was not protected under the fair dealership law, the state supreme court began by observing that the three federal district courts in Wisconsin which had addressed the issue of the applicability of the Act to manufacturer's representatives had failed to reach a consensus on the issue. This divergence of opinion indicated that the statute was ambiguous as applied to manufacturer's representatives, requiring resort to legislative history to determine the legislative intentions. The legislative history demonstrated that the Act

was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or "good will" as part of their association with the grantor of the dealership and is, thus, consistent with common or accepted perceptions of the words franchise or dealership. It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause and adequate notice.

*Id.* at 24, 313 N.W.2d 60. As examples of such businesses the court cited those "where 50% to 60% of the business' time is dedicated to the sale of one company's line of products," or those "in which the entire business is built around and relies on the sale, servicing, or representation of one grantor's products." *Id.* at 27, 313 N.W.2d 60. The state court then examined Foer-

ster, Inc.'s activities in the light of the statutory criteria of a dealership, which are:

1. a contract or agreement between two or more persons;
2. by which a person is granted
   a. the right to sell goods or services;
   b. the right to distribute goods or services; *or*
   c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; *and*
3. in which there is a community of interest in the business of
   a. offering goods or services;
   b. selling goods or services; or
   c. distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

The court concluded that although Foerster, Inc. had a contract with Atlas and a community of interest in the business of selling Atlas's goods, it had not been granted the right to sell Atlas's goods or to use Atlas's trade name, logo, or advertising. Therefore, it was not a dealer as that term is defined in the fair dealership law.

Defendant contends that the holding in *Foerster* requires a finding that the plaintiff stores are not dealerships within the meaning of the fair dealership law. I disagree.

In *Foerster, Inc.*, the state supreme court was addressing the law's applicability to manufacturer's representatives, and specifically, manufacturer's representatives that had not made the kind of substantial investment in real estate, fixtures, signs, or inventory made by the small businesspeople the legislature intended to protect under the fair dealership law.[1]

In the case before the court, there is no contention that plaintiffs were mere manufacturer's representatives for defendant. There is nothing ambiguous about the statutory language as it applies to these plaintiffs that requires resort to legislative history to determine the legislature's intentions. It is clear that the plaintiff stores met all the statutory elements for dealerships.

Unlike the plaintiffs in *Foerster* and in *Wilburn*, 719 F.2d 262, the plaintiffs in this case made substantial financial investments in their stores and fixtures, in their Walgreen signs and in Walgreen inventory. They displayed the Walgreen trademark prominently outside their stores and on the labels of their prescription drug containers. The owners of two of the plaintiff stores paid $10,000 each for good will when they purchased the stores as Walgreen agencies. Plaintiffs spent their own money for advertising. They sold directly from inventory to customers, extended credit, and, as noted, assumed all the risks of late payment or nonpayment.

Plaintiffs depended on their affiliation with defendant for their image, an important factor in at least two respects: defendant's nationally known name was a draw to tourists and others passing through towns in which the plaintiff stores are located, and the association with a chain known to be competitive in pricing offset the stereotype of the independent drugstore in a small town which can charge higher prices because it has a captive audience. The Walgreen trademark implied to the public that the plaintiff drugstores furnished the type of quality service and low prices associated with the defendant.[2] Plaintiffs

---

**1.** In a press release accompanying the introduction of the 1973 Assembly Bill 873, the governor's office stated:

> This bill is intended to protect the thousands of small businessmen in Wisconsin who are franchisees. These businessmen operate filling stations, building materials and supply houses, lumber yards, sports equipment tores, motels, hotels and restaurant chains. They sell farm implements, clothing, furniture, and many other types of goods under a franchise system. The intent in this legislation is to protect these Wisconsin businessmen from pressure from a franchisor which is not in their best interest.

Quoted in *Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 24, 313 N.W.2d 60 (1981).

**2.** *Cf. Foerster, Inc.,* 105 Wis.2d at 29–30, 313 N.W.2d 60:

shared defendant's interest in the promotion of its name and reputation for service, integrity, and value.

Defendant would like this court to read the court's statements in *Foerster, Inc.* as applying to all business entities claiming dealership status and just to manufacturer's representatives. Specifically, the defendant would like to draw from those statements an interpretation of the Wisconsin Fair Dealership Law that limits its coverage to only those businesses in which 50 to 60 percent of the business' time is devoted to the sale of one company's products, regardless of the business' financial stake in its business quarters, its investment in an inventory of the grantor's products, its assumption of the risks of payment, or its public identification in the community as the dealer representative of the grantors. I am not persuaded that there is any basis for such an expansive reading of the court's comments.

In *Foerster, Inc.*, the state supreme court was addressing the scope of the Wisconsin Fair Dealership Law only as it applied to one particular and unique type of business entity. It was not concerned with applicability of the law to any other kind of entity. In fact, throughout its opinion, the court was careful to note the many ways in which manufacturer's representatives were distinguishable from those businesspersons that made substantial investments in real estate and inventory in connection with their agency relationship that take title to or possession of the grantors' products, and typically displayed the grantors' trademark prominently outside their businesses.[3] It is fair to assume that before the state supreme court would apply the "bright line" criterion urged by defendant to businesses other than manufacturer's representatives, the court would want an opportunity to address that issue directly.

If the court found it necessary to look to legislative history to determine legislative intent as it related to businesses such as plaintiffs', the court might want to examine the extent to which the legislators had a common conception of a "franchise" in 1973 and, if so, what that common conception was. A review of the reported cases that have been brought pursuant to the Act reveals a great diversity of arrangements and relationships among the persons and entities considered to be dealers under the Act.[4] It is logical to assume that the legis-

"[Foerster, Inc.'s] extremely limited use of the Atlas name and trademark differs considerably from the use made of the grantor's trademark in the typical 'dealership' intended by the legislation. In the situation of the service station, fast food franchise, machinery distribution or clothing retailer, the trademark of the grantor or of the dealership is often prominently displayed for several purposes, including as an *implicit guarantee of a certain quality of product and service, frequently supported by the grantor's national or statewide advertising. While the product may be that of the grantor, the dealer often uses the trademark to imply that his establishment furnishes the type of quality service associated with the grantor.

In contrast, Foerster, Inc., used the Atlas logo on business cards only for the purpose of informing potential clients of his status without any notation as to the nature of the relationship. The fact that he was not allowed to adopt the trademark or symbol as his own is demonstrated by the fact that the card Atlas supplied to Foerster, Inc., identified Foerster in bold type in the center of the card with Foerster's phone number and at the bottom left-hand corner in smaller type identified Atlas with a separate phone number.

3. *See* n. 2 *supra. See also Foerster, Inc.,* 105 Wis.2d at 29, 313 N.W.2d 60:

As in *E.A. Dickinson v. Simpson Electric Company,* [509 F.Supp. 1241 (E.D.Wis.1981)], *Foerster, Inc.* was merely paid for its promotional services and did not take title or possession of the products sold by Atlas nor did it distribute them. The fact that Foerster, Inc. has no invovlement in the actual sale of Atlas products to manufacturers except to promote purchases by customers and service the customers after the sale, along with the clear legislative intent that the Wisconsin Fair Dealership Law apply only to franchises or dealerships which have a more direct involvement in sales compels the conclusion that under the facts of this case, Foerster was not granted the "right to sell" Atlas products.

4. *See,* for example, *Reinders Bros. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44 (7th Cir.1980) (plaintiff sold many lines; the Rain Bird sprinkler system accounted for no more than four percent of plaintiff's total sales in any one year); *Suburban Beverages, Inc. v. Pabst Brewing Co.,*

lature was aware of the variety of forms a franchise or dealership might take and wrote the law to apply to those that met the criteria it considered critical. Certainly, if the legislature had wished to limit the Act's protections to only those dealers that devoted at least 50 percent of their business time to the sale of the grantor's products, or to only those businesses that were entirely dependent upon the dealership relation for their economic livelihood, it would have been an easy thing to do. The absence of any such requirement argues for the proposition that the legislature did not intend any such limit.[5]

The form in which the fair dealership law is written indicates that the legislature believed that, in the competitive business of retailing, denial of access to a particular line of goods or the loss of identification with a nationally known organization can have significant adverse effects upon a small business person who has made a substantial financial investment in reliance upon its association with a grantor, whatever the relative size of the investment in the line of products or financial stake in the organization.

In summary, I am persuaded that *Foerster* does not require a holding in a case that does not concern a manufacturer's representative that a business entity that meets the criteria of a dealership as set forth in Wis.Stats. § 135.02(2) is not a protected dealership unless it can also demonstrate that 50 to 60 percent of the business' time is devoted to the promotion and sale of the grantor's products. To add such a gloss to the legislation would abrogate the will of the legislature, which intended "to protect the thousands of small businessmen in Wisconsin who are franchisees."

Plaintiffs had dealership agreements with defendant by which they were granted the right to sell defendant's products and use defendant's trade name, logo, and advertising, and that under those dealership agreements, plaintiffs and defendant had a community of interest in the business of selling defendant's goods at retail. Therefore, I find and conclude that plaintiffs are dealers as that term is defined in Wis.Stats. § 135.02.

## Damages

### 1. Miscellaneous expenses

█ The parties have stipulated to the amount of damages incurred by plaintiffs for miscellaneous expenses, including the expense of sign removal, loss of sales aids and promotional materials, losses on Walgreen merchandise in stock at the time of conversion, and the expense of converting the stores after removal of the Walgreen stock. I have found that these damages were caused by defendant's termination of its dealership agreements with plaintiffs. Therefore, plaintiffs are entitled to an award of damages for these losses and expenses in the amounts stipulated.

### 2. Inventory

As a consequence of their termination as agency stores, plaintiffs incurred losses in selling Walgreen-branded inventory that defendant refused to re-purchase. Plaintiffs are entitled to an award of damages to make them whole for these losses.

### 3. Contractual damages

Defendant contends that plaintiffs' damages should be limited to the amounts specified in paragraph 4(c) of the dealership agreements; that is, cash equal to one-half

462 F.Supp. 1301 (E.D.Wis.1978) (beer distributorship distributed several brands of beer; Pabst products represented bulk of its business); *Paul Reilly Co. v. Dynaforce Corp.,* 449 F.Supp. 1033 (E.D.Wis.1978) (plaintiff corporation bought and sold equipment manufactured by a number of different companies).

**5.** The logical place in which to incorporate such a requirement would be Wis.Stats. § 135.02(4),

which defines "community of interest." However, the legislature defined this in broad, rather than specific, terms:

"Community of interest" means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services.

of plaintiffs' purchases of defendant's products for the twelve month period preceding the termination. However, this provision is applicable to valid terminations occurring within the terms of the agreement. I have found previously that defendant's termination of plaintiffs' dealerships was not a valid act. Thus, the measure of damages is governed by the provisions of the Wisconsin Fair Dealership Law. The dealers' recoveries are not limited to amounts specified in the dealership agreements, but may include all "damages sustained by [the dealers] as a consequence of the grantor's violation [of Chapter 135], together with the actual costs of the action, including reasonable actual attorneys' fees." Wis.Stats. § 135.06.

### 4. Cost of goods delivered to plaintiffs by defendant

The parties have stipulated to the cost of goods delivered to plaintiffs by defendant for which defendant has not yet received payment. Plaintiffs do not deny that the stipulated amendments are due and owing to defendant.

### 5. Contractual penalties for late sign removal

■ Plaintiffs were aware of their duty under their dealership agreements to remove their Walgreen signs immediately upon termination or risk a fine of $500 a month. Seven of the plaintiffs did not remove their signs until many months after October 1, 1980. Therefore, defendant contends, it is entitled to the penalties set forth in the agreements.

The provisions of penalties for late sign removal in the dealership agreements assumed a valid termination. As I have noted, defendant's termination of plaintiffs' agencyships was not valid under the Wisconsin Fair Dealership Law. In breaching its agreements with plaintiffs, defendant forfeited its right to hold plaintiffs to any obligations they had under those agree-

ments. Therefore, defendant's claim for damages for plaintiffs' tardy removal of their signs will be denied.

### 6. Loss of future profits

Through the testimony of Professor Nichols, plaintiffs proved that future lost profits in the amount of $295,000 were the natural and probable results of defendant's breach of their dealership rights. An award to plaintiffs of this amount would restore them to the same position they would have been in had the terminations not occurred.

■ The law is clear that loss of future profits need not be proved with mathematical certainty; it is sufficient if the factfinder can arrive at a just and reasonably certain estimate of the loss. *Reiman Associates v. R/A Advertising*, 102 Wis.2d 305, 323–24, 306 N.W.2d 292 (Ct.App.1981); *Buxbaum v. G.H.P. Cigar Co.*, 188 Wis. 389, 393, 206 N.W. 59 (1925).

I am satisfied that it was reasonable for Professor Nichols to compare a group of plaintiff stores with a group of company-owned stores once it had been determined that sufficient data existed to permit such a comparison to be made. Further, from the observation that the two groups had the same rates of growth for the 1975–1979 period, it was reasonable to assume that they would continue to grow at the same rates in the future. (Individual differences among the stores within each group would not affect this assumption, since these same differences or others were present during the preceding years.) However, in the year 1980, there was an observable, distinct change in the relative behavior of the two groups. The best estimate of the size of that change is that it was a one-time decline in the rate of sales growth of four percent.

The testing procedure used by Nichols does not identify the cause of the change in the relationship.[6] However, the only event

**6.** In calculating plaintiffs' loss of future profits, Nichols made the assumption that their termination as agency stores was the factor respon-

sible for the decline in the rate at which their gross sales grew. To test the validity of this hypothesis, Nichols used a common statistical

common to all the stores is the plaintiffs' termination as agency stores in October, 1980. It is more probable than not that this event was the cause of the 1981 decline in the rate of annual sales growth for plaintiffs. The probability is enhanced by the evidence adduced by defendant to show that in 1981 some of the plaintiffs had increased competition, some had less; that some plaintiffs increased their advertising budgets, some decreased them; that some plaintiffs felt the effects of the economic recession in their towns; that some plaintiffs increased their business dramatically by emphasizing a special line of products (for example, Kealey) or by negotiating exclusive prescription contracts with nursing homes (for example, Kunkel). In other words, defendant has helped to show that there was no one event common to all the plaintiffs that would account for the change in behavior in their average rate of sales growth other than their termination as Walgreen agencies.

The experience of Willis Drug tends to bolster Nichols's testimony. When defendant was soliciting Willis Drugs as an agency store, its representatives estimated that Willis could expect that at the end of his first year as a Walgreen agent, his gross sales would be $390,000. In fact, his sales of $382,000 were remarkably close to that. At the end of the second year, after its agency agreement had been terminated, Willis Drug's gross sales were seven percent short of defendant's projection. In the third year they were 16.8 percent short of the projection. During this same period there were no changes in the size of his store, the store's competition remained the same except for the acquisition of new company-owned stores in Janesville and Madison, and the store's advertising expenditures increased.

At trial, defendant devoted a major portion of time to demonstrating the myriad of factors that bear on a particular drugstore's profitability, including location, ad-

vertising budget, competition, floor space, interior layout, hours, availability, parking, etc. This was intended to undercut the force of Nichols's testimony.

What defendant's approach failed to acknowledge was that Nichols's conclusions did not require any consideration of the individual factors that go into determining the profitability of a particular store. Nichols assumed that, on the average, the plaintiff stores would have continued to grow at the same rate as the company-owned stores after 1980, just as they had done for the five years before 1980. Using this averaging approach eliminated the need to take into account any of the factors that might help or hurt any one store's profitability. Nichols acknowledged that he would be unable to predict the rate of future sales growth for the plaintiff stores; no such prediction was necessary to his calculations. All he was doing was predicting, from the pre-1980 experience, that the rate of growth for the plaintiff stores would be the same as for the company-owned stores.

Although Nichols provided three independent analyses of the plaintiffs' loss of future profits, he testified, and the plaintiffs concede, that the most conservative estimate ($295,000) is the most valid. Given the limited number of years from which to analyze post-termination behavior, it makes sense to accept the average annual four percent reduced rate of growth as a one-time occurrence, rather than to project it as a continuing phenomenon.

I find and conclude that $295,000 is a just and reasonably certain estimate of the loss of future profits that plaintiffs suffered as a result of defendant's termination of their dealership agreements.

### 7. Attorneys' fees and disbursements

■ Under the fair dealership law, plaintiffs are entitled to recover their actual, reasonable attorneys' fees and their costs of litigation. Plaintiffs' actual attorneys'

procedure from which he was able to conclude that the hypothesis was valid: in 1980, there was an observable change in the relationship of

the sales of the plaintiff stores to the sales of the company-owned stores.

fees are $75,907, which I find to be reasonable, in light of the length of the proceedings and the relative complexity of the case. The disbursements also appear reasonable, taking into consideration the fact that they include the fees charged by plaintiffs' expert witness.

### ORDER

IT IS ORDERED that plaintiffs are awarded damages for the losses suffered as a reasonable consequence of defendant's illegal termination of its dealership agreements with plaintiffs in the total amount of $431,182.00, allocated among the plaintiffs as follows:

*1. Kealey Pharmacy*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $3,574.00 |
| (b) Inventory | 4,625.00 |
| (c) Offset due defendant | (3,607.00) |
| (d) Future profits | 39,235.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $52,085.00 |

*2. Milton Ave. Pharmacy*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $2,617.00 |
| (b) Inventory | 10,395.00 |
| (c) Offset due defendant | (2,066.00) |
| (d) Future profits | 38,645.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $57,849.00 |

*3. East Troy Drugs*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $2,735.00 |
| (b) Inventory | 4,261.00 |
| (c) Offset due defendant | (2,190.00) |
| (d) Future profits | 33,335.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $46,399.00 |

*4. Lake Mills Pharmacy, Inc.*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $1,736.00 |
| (b) Inventory | 4,951.00 |
| (c) Offset due defendant | (1,500.00) |
| (d) Future profits | 16,815.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $30,260.00 |

*5. Monticello Pharmacy*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $900.00 |
| (b) Inventory | 992.00 |
| (c) Offset due defendant | (2,317.00) |
| (d) Future profits | 10,030.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $17,863.00 |

*6. Delafield Pharmacy*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $1,891.00 |
| (b) Inventory | 4,936.00 |
| (c) Offset due defendant | (3,750.00) |
| (d) Future profits | 17,405.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $28,740.00 |

*7. Kunkel Pharmacy*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $1,750.00 |
| (b) Inventory | 9,496.00 |
| (c) Offset due defendant | (6,048.00) |
| (d) Future profits | 41,300.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $54,756.00 |

*8. Langmack's Drugs*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $1,381.00 |
| (b) Inventory | 6,648.00 |
| (c) Offset due defendant | (1,225.00) |
| (d) Future profits | 26,550.00 |
| (e) Costs of litigation | 8,258.00. |
| TOTAL | $41,612.00 |

*9. Monona Drive*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $602.00 |
| (b) Inventory | 1,380.00 |
| (c) Offset due defendant | (1,800.00) |
| (d) Future profits | 11,505.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $19,945.00 |

*10. Busse Pharmacy*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $1,511.00 |
| (b) Inventory | 1,955.00 |
| (c) Offset due defendant | (3,235.00) |
| (d) Future profits | 33,335.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | 41,824.00 |

*11. Willis Drugs*

| | | |
|---|---|---|
| (a) Miscellaneous expenses | $1,787.00 |
| (b) Inventory | 5,380.00 |
| (c) Offset due defendant | (2,126.00) |
| (d) Future profits | 26,550.00 |
| (e) Costs of litigation | 8,258.00 |
| TOTAL | $39,849.00 |

